60 F.Supp.2d 937 (1999)
Ellen REASONOVER, Petitioner,
v.
James WASHINGTON, Respondent.
No. 4:96CV1477 JCH.
United States District Court, E.D. Missouri, Eastern Division.
August 2, 1999.
*938 *939 *940 Wyrsch and Atwell, Cheryl Pilate, Charles Rogers, James Wyrsch, Kansas City, MO, Sindel and Sindel, Richard H. Sindel, Clayton, MO, for petitioner.
Attorney General of Missouri, Stephen Hawke, Asst. Atty. General, Jefferson City, MO, for respondent.

MEMORANDUM AND ORDER
HAMILTON, Chief Judge.
This matter arises on Petitioner's First Amended Petition for Writ of Habeas Corpus filed on June 11, 1996. (Docket # 13). The Court held an evidentiary hearing on June 28, 1999 through July 1, 1999. Because Petitioner's constitutional claims are procedurally barred, and because Petitioner cannot establish cause to excuse her procedural default, the Court must determine whether Petitioner has presented sufficient evidence of actual innocence in accordance with Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). If the Court determines that Petitioner has made a sufficient showing of actual innocence, it will rule on the merits of Petitioner's constitutional claims. See Docket # 80.

 TABLE OF CONTENTS
PROCEDURAL HISTORY 941
TRIAL EVIDENCE 942
 A. Rose Jolliff's Trial Testimony 943
 B. Mary Ellen Lyner's Trial Testimony 944
GROUNDS FOR RELIEF 945
PROCEDURAL DEFAULT 945
DISCUSSION 946
 I. Schlup v. Delo: The Actual Innocence Gateway 946
 II. Defining "New Evidence" under Schlup v. Delo 947
III. Application of Schlup v. Delo to the Evidence Presented by Petitioner 950
 A. Evidence Unavailable at the Time of Trial 950
 1. The Reasonover-White Tape 950
 a. What Petitioner Saw and Did on the Night of the Murder 951
 b. What Stanley White Did on the Night of the Murder 951
 c. Petitioner and White's Attempts to Help the Police 952
 d. Petitioner and White's Shock and Disgust about the Murder of
 the "Young Boy" 953

*941
 e. Petitioner and White's Attempts to Figure Out Why They've
 Been Arrested 953
 2. Evidence Impeaching the Credibility of Rose Jolliff's Trial Testimony 954
 a. The Jolliff-Reasonover Tape 955
 b. The Understanding Between Jolliff and the State Which Resulted
 in the Unusually Favorable Disposition of Jolliff's Pending Cases 957
 i. The Disposition of Jolliff's Pending Cases was Unusually
 Favorable 958
 ii. The Understanding Between Jolliff and the State 959
 c. Jolliff's Invocation of the Fifth Amendment 959
 3. Evidence Impeaching the Credibility of Mary Ellen Lyner's Trial
 Testimony 961
 4. Summary of the Court's Findings and Conclusions Based on Evidence
 Unavailable at the Time of Trial 963
 B. Evidence Not Presented at Trial 964
 1. Marquita (Butler) Hinton's Testimony 964
 2. Testimony of Petitioner and Lyner's Cellmates 966
 3. Petitioner's Testimony 967
 4. The Suppression Hearing Testimony of Officer Marsha Vogt 969
 5. Stanley White's Alibi 969
 6. Witnesses Testifying to Jolliff and Lyner's Character for Untruthfulness 971
 7. Petitioner's Polygraph Examination 971
 IV. The Merits of Petitioner's Constitutional Claims 972
 A. The State's Failure to Disclose Evidence Favorable to Petitioner 973
 1. Failure to Disclose the Reasonover-White Tape 973
 2. Failure to Disclose the Jolliff-Reasonover Tape 973
 3. Failure to Disclose the Existence of the Understanding Between
 Jolliff and the State 973
 4. Failure to Disclose Lyner's Prior Deal with the Prosecutors 975
 B. The Prejudice Resulting from the State's Failure to Disclose Brady
 Material 975
 1. Prejudice Resulting from Failure to Disclose the Reasonover-White
 Tape 976
 2. Prejudice Resulting from Failure to Disclose the Jolliff-Reasonover
 Tape 977
 3. Prejudice Resulting from Failure to Disclose the Existence of the
 Understanding Between Jolliff and the State 979
 4. Prejudice Resulting from Failure to Disclose Lyner's Prior Deal with
 Prosecutors 979
 5. The Net Effect of the Failure to Disclose Evidence Favorable to
 Petitioner 980
APPENDIX*
 Exhibit A: Jolliff-Reasonover Tape: Transcript Created by the Court 981
 Exhibit B Jolliff-Reasonover Tape: Transcript Submitted to the Court as Ex. A
 to Petitioner's Post-Hearing Brief 984

PROCEDURAL HISTORY
On December 2, 1983, Petitioner was convicted of capital murder, Mo.Rev.Stat. § 565.001 (repealed effective October 1, 1984) by a jury in the Circuit Court for St. Louis County in State of Missouri v. Ellen Maria Reasonover, Cause No. 488120. (Pet.App.46, 66).[1] After the jury was unable to agree on the appropriate punishment, the trial judge sentenced Petitioner to life imprisonment without the possibility of parole for fifty years. (Id., at 46, 65). The Missouri Court of Appeals affirmed Petitioner's conviction and sentence on June 17, 1986. State v. Reasonover, 714 S.W.2d 706 (Mo.App.1986). On December *942 27, 1988. Petitioner filed a Petition for Writ of Habeas Corpus. (Pet.App.604). On November 20, 1989, the Honorable Stephen N. Limbaugh denied Petitioner's habeas corpus petition, adopting United States Magistrate Judge Robert D. Kingsland's Review and Recommendation. (Pet. App.830).

TRIAL EVIDENCE
The Missouri Court of Appeals summarized the evidence at trial as follows:
On January 2, 1983, at approximately 2:00 a.m., the body of James Buckley, a gas station attendant, was discovered in the storage room of a Vickers station on West Florissant Avenue, Dellwood, Missouri. He had been shot to death. The crime was publicized, and persons who had information about the crime were asked by the police to come forward. On January 3rd a woman who identified herself as Sheila Hill called the Dellwood police department, claiming she had been at the Vickers station and had seen three persons. Officer Pike, with whom she spoke, asked her to call again to speak with Captain Chapman. She called again on January 4th, and came down to the police station at 11:30 that evening. When asked for identification, Sheila Hill identified herself as Ellen Reasonover, the defendant herein.
Defendant said she had been doing laundry and went to the Vickers station to get change. She was not sure of the time, but thought she was at the station at about 1:30 a.m. the night of the murder. Defendant, who was considered a witness at this time, was taken to the Vickers station to reenact what she had seen. She stated that as she drove up, she saw a cream-colored station wagon leave the station. She also saw a black man in the cashier's cage, whom she assumed was an attendant. As she approached the cashier's cage, the black man took off his cap and left the cage to enter the main part of the station. Defendant knocked loudly on the window of the cage, but the black man did not return. She also saw a car parked on the right side of the building, which she described as a dark blue or black Oldsmobile or Buick with silver or gray trim and a spare tire container protruding from the top of the trunk. She described a second black man that she saw at the station, who was taller than the first and wore a green Army jacket. A third person was in the back of the car. As defendant was pulling out of the station she saw the man from the cashier's cage enter the car. She then proceeded to a nearby 7-Eleven store, where she again saw the two men as she was coming out of the store. Defendant then returned to the laundromat.
In the early morning hours of January 5th, defendant picked out two photographs from 250 photographs shown to her by the police. The photographs were of Isaac Scott and Herman Staples. In subsequent lineups, she failed to pick out Isaac Scott but did identify Herman Staples as one of the two men she had seen. Upon investigation, the police discovered that the two men defendant picked out had both been incarcerated at the time of the crime. At about this time, it also came to the attention of the police that defendant had complained to the police about an ex-boyfriend who had broken out the windows of her car. The man was Stanley White, and he was seen by the defendant driving away in a car remarkably similar in description to the car she had described to the police as being at the Vickers station. The incident took place only a few days before the murder.
Upon being told by the police that the men she had picked out were in custody at the time of the murder, defendant stated she would try to get the name of the man with the cap from her sister or her sister's friend, as she believed she had seen this man at various parties. She gave the police the name of Willie Love, and identified him from a photographic array. On January 6, defendant identified Willie Love in a lineup. Also on January 6, the police began to question *943 defendant about the incident concerning her car windows.
On January 7 defendant was ... questioned about her activities from December 31, 1982 to January 3, 1983 in order to establish her whereabouts on the night of the murder. She repeated a sequence of events six times, and only once did she mention that she had been at the Vickers station January 2.... Defendant was then arrested and given her Miranda warnings.[2]
Later, on the evening of that same day, defendant was transported from the Dellwood jail to the Jennings jail, where she was placed in a cell with Rose Jolliff and Marquita Butler. Defendant was released the following morning, January 8. Rose Jolliff later talked with the police who were investigating the murder. In essence, Jolliff stated that the defendant admitted committing the crime with Stanley White and Robert McIntosh. Defendant told Jolliff that she shot the victim seven times with a rifle because something had gone wrong and she feared the victim could identify her.
On February 9, 1983, the defendant was in custody on a separate unrelated charge, and was placed in a holdover cell of the St. Louis County jail with Carol Coates, Rose Winston, Elaine Carpenter, and Mary Ellen Lyner. Lyner subsequently made a deal with the prosecution in exchange for her testimony regarding admissions made by the defendant to her while both were confined in the holdover cell. The admissions in question are: "Those mother-fuckers picked me out of a lineup. I told them we should have blew their brains out too," and "Girl, we robbed a gas station and killed a man, you know, that Vickers station. I stay right down the street from there."
Subsequent to the admissions to Lyner, defendant had several conversations with various police officers, during which she threatened the officers and accused them of "putting a case on her," and stated that she would not "come in" or "roll over" on anyone. Stanley White was identified as being at the Vickers station on the night of the murder by a witness, Kenneth Main, who identified White on January 7, after his memory had been refreshed through hypnosis. On March 4, 1983, Robert McIntosh was identified as being at the Vickers station on the night of the murder by another witness. Anthony Longo.
Reasonover, 714 S.W.2d at 710-12.
In denying Petitioner's sufficiency of the evidence claim, the Missouri Court of Appeals relied on the following facts:
[D]efendant admitted to the police that she was present at the Vickers station on the night of the murder, close in time to when the murder was committed; she specifically admitted to Rose Jolliff and generally admitted to Mary Ellen Lyner that she committed the offense, along with Stanley White and Robert McIntosh; and both Stanley White and Robert McIntosh were identified as being at the scene of the crime around the time of the murder.
Reasonover, 714 S.W.2d at 712.
As the findings by the Missouri Court of Appeals reflect, the State's case against Ellen Reasonover was based almost entirely on the testimony of Rose Jolliff and Mary Ellen Lyner. For clarity, the Court will describe in greater detail the trial testimony of these witnesses.

A. Rose Jolliff's Trial Testimony

The linchpin of the State's case was the testimony of Rose Jolliff. Jolliff testified that she was in custody at the Jennings jail on January 7, 1983, when, at approximately 10:00 p.m., Petitioner was brought into the same cell. (Trial Tr., at 673-74). Jolliff and Petitioner had never before *944 met. (Id., at 678). According to Jolliff, Petitioner admitted that she "did the Vicker's Station robbery and murder, and she went on to say how it was done and how it was supposed to have been." (Id., at 675). Jolliff testified that Petitioner said that she committed the crimes with Robert McIntosh and Stanley White, and that "someone was supposed to have went up to the window, one of the guys, to distract the boy at the window and something supposedly went wrong ... [s]o when something supposedly went wrong, she had to shoot him."[3] (Id.). Jolliff testified that Petitioner admitted shooting the Vicker's attendant "seven times" with a "rifle," and stated that she and her accomplices also "beat" the attendant. (Id., at 675-76). According to Jolliff, Petitioner stated that the attendant "wasn't supposed to see her, so she had to shoot him" because "she lived close by and he could identify her." (Id., at 676-77). Jolliff testified that Petitioner recounted these events in "good humor." (Id.). During Petitioner's statements to Jolliff, Marquita Butler, the only other person in the cell, was sitting on the "next bunk." (Id., at 679, 690, 693-94).
Jolliff testified that she had been put on probation several times  once for passing bad checks and another time for interfering with the mail  and had an "account closed check case" pending in St. Louis County. (Id., at 681). She testified that, although she had received probation several times, she had never been convicted of a crime. (Id., at 683-84). Jolliff testified that neither the prosecutor. Steven Goldman, nor anybody else, offered to make a deal with her with regard to the pending case. (Id., at 681). She testified that neither Goldman, nor anybody else, promised her "any kind of deal" in exchange for her testimony. (Id., at 700). Jolliff further testified that she was never promised that she would get "any kind of recommendation on [the pending] case at all" in exchange for her testimony. (Id., at 701). Jolliff stated that she was testifying because, if something happened to one of her kids, she would want someone to testify. (Id., at 702).

B. Mary Ellen Lyner's Trial Testimony

Mary Ellen Lyner testified that, on February 9, 1983, she was in custody in the St. Louis County Court "holdover"  a cell where prisoners are held before they are brought into the courtroom. (Trial Tr., at 608). Petitioner, Carol Coates, Rose Winston, and Elaine Carpenter were also in the holdover. (Id.). Lyner testified that when Petitioner came into the holdover she sat down and said, "Those mother fuckers picked me out of a line-up. I told them we should have blew their brains out too." (Id., at 609). Lyner testified that Petitioner then stated. "Girl, we robbed a gas station and killed a man, you know, that Vicker's Station. I stay right down the street from there." (Id., at 610).
Lyner admitted that she had been convicted of thirteen crimes  eight bad check charges, four stealing charges, and one misdemeanor assault  and that she had four forgery counts pending in St. Louis Count and one pending bad check case in the City of St. Louis (Id., at 607, 612). Lyner testified that, although twelve of her thirteen convictions were for felonies, she had never been sentenced to time in a penitentiary. (Id., at 616, 618, 621). Lyner admitted that, in exchange for her testimony, Steven Goldman promised to recommend one year in jail on her pending forgery charges, and to recommend one year concurrent on the pending "check charge" in the city. (Id., at 612). Lyner testified that this was the first time she had made a deal with a prosecutor to avoid serving time in a penitentiary. (Id., at 675).
Lyner testified that, after informing the police about Petitioner's statements, she was transferred from the St. Louis County *945 Jail to a "work release dorm." (Id., at 617). Lyner had been in the St. Louis County Jail since November 18, 1982 because she was unable to post bond on her pending charges. (Id., at 612, 617). Lyner admitted that, on February 9, 1983, she was "looking for a way not to go to the penitentiary," and that she was "looking for a deal." (Id., at 620).

GROUNDS FOR RELIEF
In her First Amended Petition for Writ of Habeas Corpus, Petitioner asserts the following grounds:
I. Ms. Reasonover was denied due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution when the prosecutor failed to produce to the defense material, exculpatory evidence. (First Amended Petition, at 63).
II. The State's failure to provide to Petitioner a taped copy of her recorded statement violated her rights to a fair trial and due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. (Id., at 69).
III. The State violated Ms. Reasonover's constitutional rights to due process and a fair trial by failing to disclose to defense counsel Petitioner's statements to police on January 7, 1983, denying any involvement by her or Mr. White in the Vicker's crime. (Id., at 71).
IV. The State violated Ms. Reasonover's rights to due process and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments by failing to disclose evidence bearing upon the credibility of State's witnesses Ken Main, Rose Jolliff, and Mary Ellen Lyner. (Id., at 74).
V. The cumulative effect of all of the Brady violations undermined confidence in the outcome of the trial and deprived Ms. Reasonover of a fair trial and due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments. (Id., at 92).
VI. Prosecutorial misconduct permeated the entirety of Ms. Reasonover's trial, and denied her a fair trial and due process of law in violation of the Fifth, Sixth, and Fourteenth Amendments. (Id., at 94).
VII. Ms. Reasonover was denied due process of law and effective assistance of appellate counsel in that appellate counsel failed to fully investigate the criminal backgrounds of Lyner and Jolliff, failed to raise as plain error the prosecutor's comments on Ms. Reasonover's failure to testify; and failed to move to compel production of the tape recording of the Reasonover-White conversation in the appellate court. (Id., at 97).
VIII. Ms. Reasonover was denied due process of law and the effective assistance of counsel in that trial counsel failed to investigate and present exculpatory evidence, failed to vigorously and effectively cross-examine the State's informants, failed to object during trial to Ken Main's identification of Stanley White and failed to object to the prosecutor's comment that Reasonover failed to testify. (Id., at 99).
On June 29, 1999 and on July 12, 1999, the Court granted Petitioner leave to amend her First Amended Petition. (Docket #96, 103). Petitioner's amendments supplement the grounds in her First Amended Petition by incorporating evidence adduced at the evidentiary hearing. (Id.).

PROCEDURAL DEFAULT
In a Memorandum and Order entered on June 16, 1999, the Court concluded that the claims in Petitioner's First Amended Petition were procedurally defaulted and that Petitioner was unable to establish cause and prejudice to excuse her procedural default. (Docket # 80, at 3-5). To the extent that Petitioner raises separate grounds in the amendments to her First Amended Petition, these grounds suffer from the same unexcused procedural default as a result of Petitioner's failure to file a Rule 27.26 motion in state court. (Id.). See Hall v. Delo, 41 F.3d 1248, 1249 *946 (8th Cir.1994). (Pet.App.650-51, 830). Because Petitioner cannot establish cause to excuse her procedural default, the Court may reach the merits of her claims only if she presents sufficient evidence of actual innocence in accordance with Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

DISCUSSION

I. Schlup v. Delo: The Actual Innocence Gateway

In Schlup, the Supreme Court reaffirmed the principle that "habeas corpus is, at its core, an equitable remedy." Schlup, 513 U.S. at 319, 115 S.Ct. 851. Based on this underlying principle, the Supreme Court has long-recognized the duty of a habeas court to adjudicate procedurally defaulted claims when failure to so would result in a "fundamental miscarriage of justice." Id., at 320-21, 115 S.Ct. 851 (citing Sawyer v. Whitley, 505 U.S. 333, 339-340, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); McCleskey v. Zant, 499 U.S. 467, 495, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); Smith v. Murray, 477 U.S. 527, 537, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); Murray v. Carrier, 477 U.S. 478, 495-96, 106 S.Ct. 2678, 91 L.Ed.2d 397 (1986); Kuhlmann v. Wilson, 477 U.S. 436, 452, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); Engle v. Isaac, 456 U.S. 107, 135, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)).
"To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the `extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, th[e] [Supreme] Court explicitly tied the miscarriage of justice exception to the petitioner's innocence." Schlup, 513 U.S. at 321, 115 S.Ct. 851 (citing Kuhlmann, 477 U.S. at 452, 106 S.Ct. 2616; Carrier, 477 U.S. at 496, 106 S.Ct. 2678). "Explicitly tying the miscarriage of justice exception to innocence thus accommodates both the systemic interests in finality, comity, and conservation of judicial resources, and the overriding individual interest in doing justice in the `extraordinary case.'" Schlup, 513 U.S. at 322, 115 S.Ct. 851 (internal citation omitted).
In Schlup, the Supreme Court held that a habeas court could review the merits of procedurally defaulted constitutional claims if the petitioner showed that a "`constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Schlup, 513 U.S. at 327, 115 S.Ct. 851 (quoting Carrier, 477 U.S. at 496, 106 S.Ct. 2678). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence  whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence  that was not presented at trial." Id., at 324, 115 S.Ct. 851. A petitioner must show that, in light of the new evidence, "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt."[4]Id., at 327, 115 S.Ct. 851 ("[P]etitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.").
A petitioner meets his burden under Schlup if he presents "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the Court is also satisfied that the trial was free of nonharmless constitutional error." Id., at 316, 115 S.Ct. 851. Thus, a claim of actual innocence under Schlup is "`not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim[s] considered on the merits.'" Schlup, 513 U.S. at 315, 115 S.Ct. 851 (quoting Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)).
*947 The Supreme Court explained that the Schlup gateway is designed to "focus the inquiry on actual innocence," rather than legal innocence. Id., at 327, 115 S.Ct. 851. See also, Calderon v. Thompson, 523 U.S. 538, 118 S.Ct. 1489, 1503, 140 L.Ed.2d 728 (1998) ("`[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence.'") (quoting Sawyer, 505 U.S. at 339, 112 S.Ct. 2514) (alteration in original). For this reason, a district court considering a claim under Schlup is "not bound by rules of admissibility that would govern at trial." Schlup, 513 U.S. at 327, 115 S.Ct. 851. "[T]he emphasis on `actual innocence' allows the reviewing tribunal to consider the probative force of relevant evidence that was either excluded or unavailable at trial." Id., at 327-28, 115 S.Ct. 851. The habeas court must make its determination under Schlup "`in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial.'" Id., at 328, 115 S.Ct. 851 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142, 160 (1970)).
The habeas court must consider the "probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." Schlup, 513 U.S. at 332, 115 S.Ct. 851. "The newly presented evidence may ... call into question the credibility of witnesses presented at trial." Id., at 330, 115 S.Ct. 851. Thus, the habeas court must assess the credibility of witnesses in light of the new evidence and the evidence presented at trial. Id., at 330-32, 115 S.Ct. 851.

II. Defining "New Evidence" under Schlup v. Delo

The Eighth Circuit has instructed that, when considering the sufficiency of a petitioner's showing under Schlup, the district court may only consider evidence that was "not available at trial and could not have been discovered earlier through the exercise of due diligence." Amrine v. Bowersox, 128 F.3d 1222, 1230 (8th Cir. 1997) (en banc). In support of its definition of new evidence, the Eighth Circuit cited Smith v. Armontrout, 888 F.2d 530, 542 (8th Cir.1989). Amrine, 128 F.3d at 1230. In Smith, decided five years before Schlup, the Eighth Circuit held that a petitioner might avoid the "abuse of the writ" doctrine if a claim omitted from a previous petition was based on facts that "could not have been discovered earlier in the exercise of reasonable diligence...." Id., at 541. Because the evidence proffered by Smith was available at the time the prior petition was filed, the Court concluded that to allow Smith to rely on the evidence in the subsequent petition would "sanction a clear abuse of the writ." Id., at 542.
Reliance on Smith to define "new evidence" in a Schlup claim is inappropriate because the actual innocence exception does permit a habeas court to review the merits of a constitutional claim, notwithstanding that the claim is abusive, successive, or otherwise procedurally barred. See Schlup, 513 U.S. at 316-17, 115 S.Ct. 851 In addition, while the abuse of the writ doctrine is designed to prevent habeas petitioners from deliberately withholding available claims, the actual innocence exception is designed to identify extraordinarily cases in which a "`constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Id., at 327, 115 S.Ct. 851 (quoting Carrier, 477 U.S. at 496, 106 S.Ct. 2678). Because some of the evidence presented by Petitioner is not "new evidence" as defined by Amrine, the Court must attempt to reconcile the tension between the Eighth Circuit's definition of "new evidence" and the Supreme Court's opinion in Schlup.
In Schlup, the Supreme Court stated that a petitioner must support his allegations of constitutional error with "new reliable evidence ... that was not presented at trial." Schlup, 513 U.S. at 324, 115 *948 S.Ct. 851. Although the Supreme Court could have defined "new evidence" to include only evidence that was unavailable at the time of trial and could not have been discovered through the exercise of due diligence, it did not do so. The Supreme Court referred to "unavailable" evidence in only one paragraph in its opinion:
[T]he district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on `actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the ... standard, we believe that Judge Friendly's description of the inquiry is appropriate: The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."
Schlup, 513 U.S. at 327-28, 115 S.Ct. 851 (footnote omitted).
In the foregoing paragraph, the Supreme Court did not limit "new evidence" to evidence which was unavailable at the time of trial. Rather, the Supreme Court directed the habeas court to consider "all the evidence," which includes, but is not limited to, evidence "available only after trial." Id. This interpretation is consistent with the Supreme Court's earlier statement requiring a petitioner to support his allegations of constitutional error with "new reliable evidence ... that was not presented at trial." Schlup, 513 U.S. at 324, 115 S.Ct. 851. See also, Calderon, 118 S.Ct. at 1503 ("[A] claim of actual innocence must be based on reliable evidence not presented at trial."). Furthermore, this interpretation is consistent with the Supreme Court's view that, because of the "emphasis on actual innocence," a habeas court considering a Schlup claim is permitted to consider a "broader array of evidence." Id., at 328, 115 S.Ct. 851.
The Supreme Court's delineation of what constituted "new evidence" under the facts of Schlup further reveals the conflict between the Eighth Circuit's definition of "new evidence" and that of the Supreme Court in Schlup. The essential underlying facts in Schlup were summarized by the Eighth Circuit in Amrine:
Schlup was a Missouri prisoner who had been convicted of participating in the murder of a fellow inmate and sentenced to die. The state's case at trial consisted primarily of eyewitness testimony from two correctional officers who said they had seen Schlup holding the victim while another inmate stabbed him. Schlup denied involvement and presented a videotape showing him entering the dining hall shortly after the stabbing. He claimed he could not have reached the hall at the time shown on a clock if he had participated in the murder.
Amrine, 128 F.3d at 1227. The Supreme Court stated that the affidavits of John Green and Lieutenant Robert Faherty were "new statements" which were "particularly relevant" in determining whether Schlup presented sufficient evidence of actual innocence. Schlup, 513 U.S. at 317, 331, 115 S.Ct. 851. The Supreme Court did not suggest that statements of Faherty and Green were unavailable at the time of trial. Rather, the Supreme Court indicated that both witnesses were available at the time of trial and were willing to state precisely what they stated in their affidavits in the habeas proceeding. Id., at 311 n. 21, 312 n. 25, 115 S.Ct. 851. The Supreme Court noted that "Faherty had testified at Schlup's trial, but had not been asked about the significant details of his encounter with Schlup that are recited in his affidavit." Id., at 312 n. 25, 115 S.Ct. 851. The Court further noted that Green stated in an affidavit in the habeas proceeding that, if he had been contacted before Schlup's trial, he would have informed Schlup's attorney of the information contained in his affidavit. Id., at 311 n. 21, 115 S.Ct. 851. The United States Supreme Court characterized Faherty and Green's affidavits as "new statements," *949 even though the information in those statements was available at the time of trial and could have been discovered in the exercise of due diligence.[5] Thus, the Supreme Court's definition of "new evidence," as articulated and as applied in Schlup, is broader than the Eighth Circuit's definition.
The Eighth Circuit's definition of "new evidence" limits the scope of the fundamental miscarriage of justice exception in a manner not contemplated by the Supreme Court. The availability of the fundamental miscarriage of justice, or actual innocence, exception is extremely limited, according to the Supreme Court, not because the petitioner must present evidence that was unavailable at the time of trial, but because "habeas corpus petitions that advance a substantial claim of actual innocence are extremely rare." Schlup, 513 U.S. at 321, 115 S.Ct. 851. By requiring the petitioner to bear the burden of proving that it more likely than not that no reasonable juror would convict in light of the new evidence, the Supreme Court accommodated the "systemic interests in finality, comity, and conservation of judicial resources, and the overriding interest in doing justice in the `extraordinary case.'"[6]Schlup, 513 U.S. at 322, 115 S.Ct. 851. Because evidence sufficient to sustain this burden is "unavailable in the vast majority of cases, claims of actual innocence are rarely successful."[7]Schlup, 513 U.S. at 324, 115 S.Ct. 851. The Supreme Court, therefore, emphasized that, by their nature, substantial claims of actual innocence are extremely rare. Id. To restrict the availability of the actual innocence exception based upon whether the evidence was available at the time of trial places greater limits on the exception than the Supreme Court contemplated in Schlup.[8]

*950 III. Application of Schlup v. Delo to the Evidence Presented by Petitioner

Because of the different definitions of "new evidence" specified in the previous section, see supra, Discussion Section II, the Court will divide its discussion of the evidence it considered in assessing Petitioner's showing of actual innocence into two sections  evidence unavailable at the time of trial and evidence not presented at trial. The former section consists of reliable evidence that is "new" within the meaning of the Eighth Circuit's decision in Amrine. The latter section consists of all other reliable evidence of actual innocence which was presented to this Court, but not presented during Petitioner's trial.
This case does not present the Court with the difficult choice of whether it is appropriate to follow the definition of new evidence articulated in Amrine in light of its inconsistencies with the Schlup opinion because the Court concludes that the evidence presented by Petitioner that was unavailable at the time of trial, see infra, Discussion Section III.A, is more than sufficient to prove Petitioner's claim of actual innocence under Schlup v. Delo. The evidence which was available, but not presented at trial, see Discussion Section III.B, infra, strengthens, but is not essential to, Petitioner's successful showing of actual innocence.

A. Evidence Unavailable at the Time of Trial

1. The Reasonover-White Tape

Petitioner was arrested for the Vicker's murder at approximately 1:00 p.m. on January 7, 1999. (Suppression Hr'g Tr., at 64). See Reasonover, 714 S.W.2d at 711. Petitioner was arrested at the Dellwood police station where she had been "interviewed" during the previous two hours. (Suppression Hr'g Tr., at 61-62, 70-71). After her arrest  but before she was incarcerated with Rose Jolliff, at approximately 10:00 p.m., at the Jennings jail  Petitioner was put into a cell at the Dellwood jail. (Reasonover Test., Sta. White Test., Chapman Test.; Pet.Ex. 1-2).
Stanley White, who had also been arrested for the Vicker's murder, see Suppression Hr'g Tr., at 67, was placed in a separate cell next to Petitioner at the Dellwood jail. (Reasonover Test., Sta. White Test., Chapman Test.). The two cells were on the same side of a hallway and were separated by a wall. (Reasonover Test., Sta. White Test.). Petitioner and White saw each other when White was escorted down the hallway to his cell. (Id.). After White was locked in his cell. Petitioner and White could not see each other. (Id.). Petitioner and White, however, could hear each other and engaged in an extended discussion. (Id.). Although Petitioner and White thought they were engaged in a private conversation, see id., the police secretly recorded their conversation.[9] (Chapman Test.; Pet.Ex. 1-2). The purpose of recording Petitioner and White was to see whether, in a private discussion, they would say anything incriminating. (Chapman Test.). To that end, a recording device was strategically placed in an area around the cells, and Petitioner and White were left alone to talk. (Id.).
The tape of the conversation between Petitioner and White ("Reasonover-White Tape") is approximately fifty-six minutes in length. (Pet.Ex.1-2). The parties stipulate that Petitioner's Exhibit 1 is an accurate copy of the tape, and that Petitioner's Exhibit 2 is an enhanced version of the tape which does not alter the spoken words in any way. (Stipulations, ¶¶ 1-2). *951 The Court finds that Petitioner's Exhibit 3 is a written transcript of the spoken words which can be heard on the Reasonover-White Tape. (Pet.Ex.1-3). Because Petitioner and White believed they were engaged in a candid discussion, and because the tape is accurate recording of what was said, the Court finds that the tape is reliable evidence material to Petitioner's showing of actual innocence. See Schlup, 513 U.S. at 324, 115 S.Ct. 851 (petitioner must support claim of actual innocence with "reliable evidence"); Amrine, 128 F.3d at 1230 (habeas court must determine if the "evidence is reliable"). Although Petitioner and White's candid statements are laced with profanity and could best be described as "street talk," the natural language confirms that Petitioner and White believed that they were talking only to each other.

a. What Petitioner Saw and Did on the Night of the Murder

Petitioner tells White that she drove her car to the laundromat at around midnight on the night of the murder to do laundry. (Pet.Ex. 3, at 6, 30). Between 1:15 a.m. and 1:45 a.m., Petitioner drove her car to the Vicker's station to get some change. (Id., at 3, 30). Petitioner got out of her car and, while "standin' off at a distance," saw a man at the cashier's window who she believed was Willie Love. (Id., at 35) ("And you know who it was? ... William Love, Looked like it. I'm pretty sure it was. But then, you know, it might not `cause see I was standin' off at a distance. See what I'm sayin'?"). See also, Id., at 3, 6, 10, 14. The man whom Petitioner saw at the window was wearing a red and black shirt. (Id., at 5) ("[H]e had on a red shirt .... had black checkers, um cotton, fishin' huntin' shirt."). See also Id., at 26, 35. After she saw the man at the window, he "took his cap off and went in the back." (Id., at 5). Petitioner tells White that she saw another man at the Vicker's station, and that this man was wearing a green army jacket. (Id., at 5, 8, 14).
Petitioner tells White that she knocked on the cashier's window at Vicker's, but could not get any service. (Id., at 3, 30). See also, Id., at 33 ("Yeah, knocked on the motherfuckin' window and shit, and the nigger didn't come back to the window."). Unable to get change at the Vicker's station, Petitioner drove her car to a nearby 7-Eleven. (Id. at 3, 33). Petitioner tells White that the same men she saw at the Vicker's station arrived at the 7-Eleven shortly after she did. (Id., at 8) ("And when I got up to 7-Eleven I seen Love again and I seen his friend ... in that army jacket."). See also, Id., at 3, 10, 35. After getting change at 7-Eleven, Petitioner returned to the laundromat, finished her laundry, and drove home. (Id., at 24) ("When I went to the laundromat and came back ... I had to make six trips up and down to the car to bring the clothes up.").

b. What Stanley White Did on the Night of the Murder

Petitioner discusses the fact that she and Stanley White were not together on the night of the murder. Petitioner and White had not seen each other since White "knocked out" the windows in Petitioner's car, which was several days prior to the Vicker's murder.[10] (Pet.Ex. 3, at 4, 14). Evidently, White and Petitioner had been dating and White's actions relating to Petitioner's car triggered a breakup. (Id., at 14) (W: "Still love me, baby?" R: "Nope and I told you ... that shit dead after what ya'll did to me. I told em' `Yeah, last time I seen Stan was the uh, the night he broke out my windows. He's been calling me `bout a thousand time, but I ain't seen him since.' You know that shit dead ... you know you drink too much ... turn you wild.").[11]
*952 White does not appear to know when the murder occurred. He asks Petitioner several times about when the murder happened. (Id., at 19) ("Now, this incident took place Saturday night?"). See also, Id., at 6 (W: "What night's that?" R: "Saturday night carrying over to Sunday mornin'. Saturday night  think I got [to the laundromat] `bout twelve o'clock."). Petitioner reminds White that she called him on that Saturday night and told him that she was "goin' down to do that wash." (Id., at 6). White recalls that he had been staying at "Woody's" house since the previous Tuesday, he had not been out toward the Vicker's station since Saturday morning, and was at "Woody's" house on Saturday night. (Id., at 6-7, 19-20, 24, 31).

c. Petitioner and White's Attempts Help the Police

Early on during their conversation, White encourages Petitioner to tell the police exactly what she saw. (Id., at 4). Petitioner responds, "I told! They know that, they know that, that I told `em I seen that nigger William Love at the window, or if it wasn't, it was his motherfucking twin. And I told `em I had seen `em up there at the 7-Eleven too, they know that ... I told." (Id.). Later, White asks Petitioner if she told the police whom she saw. (Id., at 6). Petitioner responds, "Yeah, I told `em Willie Love ... Hell yeah, I told `em." (Id.). See also, Id., at 27 (W: "Now I don't know who did what, but, uh  You know what you seen don't ya?" R: "Fuck, yeah!").
Petitioner repeatedly states that she was just trying to help the police, but now regrets coming forward as a witness. (Id., at 13-14) ("Be glad when these motherfucks get they shit together. But if I ever do see that dude again in that green army jacket on an the nigger out there at the window I won't tell no motherfuckers shit! I was trying to help them.... I told `em who I thought I seen.... They don't believe me. These motherfuckers are crazy!"). Petitioner states, "I'm tryin' to help they motherfuckin' ass an' tell `em who I seen behind that motherfuckin' window. They standin' there tellin' me Love is a diamond man. I don't give a fuck. I know what the fuck I seen up there at the window. Hell, it sure the fuck looked jus' like him ..." (Id., at 10). See also, Id., at 8.
Petitioner says that, if she had information that White or anybody else was involved in the murder, she would tell the police. Petitioner says, "[I]f I had somethin' to do with that shit, ... I'd a snitched on you and everybody else that I thought was involved." (Id., at 4). White agrees with Petitioner, saying, "If you did, if we did do that, you s'posed to tell em," to which Petitioner responds, "I'da told `em! Hell, yeah I'da told `em! Shit, I told `em if I'd been up there with ya, and you did it, I'da jumped out the car and ran to the motherfuckin' police station!" (Id., at 11-12).
Petitioner and White discuss how the police attempted to get each of them to "spill the beans" on the other. Petitioner quotes the police, saying "`Soon as Stan spill the beans on you, you gonna be gone and he gonna be out.'" (Id., at 16). The following exchange ensued:
W: I ain't got no beans to spill.
R: I'm tellin' ya!
W: And going to tell you somethin'  if had some they gonna be fallin'! You hear me? ... Just like if you knew, if I knew somethin' was goin' on and you knew somethin' was going on you might  hey 
R: You know how I run my mouth! I'da told `em quick!
....
W: I'm gonna tell you somethin'. I don't give a fuck what they say to me. I'm speakin' the truth for what I know.
R: Hell, yeah!
W: I know I ain't did nothin'
R: Hell, yeah! I been telling the truth all day.
(Id., at 16-17). Petitioner recalls the police saying, "He gonna spill the beans on *953 you in a minute. You might as well spill them on him first." (Id., at 33). White then says. "Ain't no beans to be spillin'," to which Petitioner responds, "I'm tellin ya'. Ain't no motherfuckin' beans to spill. These motherfuckers is crazy!" (Id.).[12]

d. Petitioner and White's Shock and Disgust about the Murder of the "Young Boy"

Petitioner and White repeatedly express shock and disgust over the murder of the Vicker's attendant. Petitioner says to White, "I know you ain't did no shit like that.... Talking `bout rob and kill some motherfucker, took a young boy's life, aint that a bitch? And here I gotta motherfuckin' daughter." (Id., at 4). Petitioner says that whoever took the "young boy's" life is "sick" and "cold," to which White responds, "I'm tellin ya!" (Id., at 13). See also, Id., at 40 (R: "These motherfuckers gotta be out of their mind and think that we gonna take a young boy's life, Stan. Ain't that pitiful?" W: "I'm tellin' ya!").
Petitioner and White comment about how the police officers showed them pictures of the victim's dead body. Petitioner and White stated as follows:
W: I'm tellin' ya. That hurt me ba , it hurt me even knowing that happen....
R: I'm tellin' ya, boy! It hurt me when I heard it happened too, `cause it right around from my corner and plus they showed me these pictures, boy, and that really fucked me up. They really fucked me up.... [I]t don't make no difference, he coulda been red, white, black, blue  he's a young boy and he got killed. I don't trip off the mother-fuckin' color. But if  You know if he'd been a black boy, they wouldn'ta been all about this, tryin' to find out who killed him and shit.
(Id., at 37). In another exchange. Petitioner and White state as follows:
R: [T]hey had the nerve to show me that little[13] white boy picture. That jus' really fucked me up.
W: Did it?
R: Yeah they showed that shit. He look all pitiful layin' down there. I said, `Man, whoever killed him, that was cold.' That was really cold. They, did they show it to you?
W: Um hum (affirmative)
R: And they gone tell me  I say, `You get that bullshit out of my face. I don't wanna see that bullshit.' Then he gonna go upstairs and tell everybody in the building that I didn't want to look at it. Then gonna come back and ask me `why you ain't ... gonna look at the pictures?' I said, `For what? I done seen too many motherfuckers below my feet dead and I ain't about to see, ready to see no more.'
(Id., at 29). See also, Id., at 8 (W: "They showed me them pictures I mean, I just looked like and I ... babe ... I ..." R: "Of that dead dude?" W: "Yeah." R: "Yeah, I, they showed me them pictures too. I told `em, `Get ... that shit outta my face. I don't wanna look at no shit like that.' And I didn't look at that shit. I threw that shit back at him. I turned that shit over. Fuck that shit. See nobody dead. I ain't did shit!").

e. Petitioner and White's Attempts to Figure Out Why They've Been Arrested

Petitioner and White search in vain for a reason why they've been arrested. Petitioner *954 and White believe that White has probably been arrested because he is wearing a red and black shirt similar to the one worn by the man that Petitioner saw at the cashier's window. (Id., at 5) (R: "I ain't never seen you with that shirt on before, ain't gonna lie to `ya ... [H]e had on a red shirt like yours, had black checkers, um cotton, fishin' huntin' shirt.... That's what that nigger had on at the window.... That's why they probably trippin' off of you so tough."). See also, Id., at 8, 10, 14, 26, 28, 30, 35. Petitioner also tells White that she thinks he may have been arrested because the police know he broke the windows out of Petitioner's car. (Id., at 8). Petitioner and White believe that Petitioner has probably been arrested because the police had previously accused her of robbing another Vicker's station. (Id., at 11, 16, 27, 32). Petitioner and White think that, perhaps, the police just "want somebody."[14]

2. Evidence Impeaching the Credibility of Rose Jolliff's Trial Testimony

The Reasonover-White Tape casts grave doubt upon the credibility of Rose Jolliff's trial testimony. The tape contains a candid, reliable account of Petitioner and Stanley White's actions before, during, and after the murder of James Buckley. The tape describes Petitioner and Stanley White's bewilderment over their arrests, their shock and disgust about the murder of James Buckley, a "young boy," and their efforts to help police. Because they were recorded, Petitioner's statements to Stanley White, do not depend on the credibility or motives of an informant. Significantly, Petitioner's statements on the Reasonover-White Tape, regarding what she saw and did on the night of the murder, are consistent in all relevant respects to the recording of Petitioner's statements to Captain Dan Chapman on January 4, 1983 ("Sheila Hill Tape").[15] (Trial Tr., at 442, 472). See Pet.Ex. 24.
In order to believe Rose Jolliff, a finder of fact would have to believe that, just hours after her conversation with Stanley White, Petitioner contradicted herself in every relevant respect to a woman whom she had never before met. Not only is Jolliff's account of Petitioner's statements impeached by almost every statement on the Reasonover-Tape, but Jolliff's account is not corroborated in any way by the Reasonover-White Tape. For instance, Petitioner and White never mention anyone by the name of Robert McIntosh, or any nickname likely to be associated with the name of Robert McIntosh. Petitioner and White never mention any details suggesting that they know the specific manner in which James Buckley died; they do not mention that Buckley was shot seven times; they do not mention that a rifle was used; they do not mention who shot the gun. Petitioner and White never mention any details suggesting that they know what the intentions of the assailants were; they do not mention knowing that someone was supposed to distract the boy at the window; they do not mention that the boy was shot because he could identify the assailants.
The Court finds that the contents of the Reasonover-White Tape discredits the trial testimony of Rose Jolliff. Based on the contents of Reasonover-White Tape alone, this Court concludes that it "more likely than not that no reasonable juror would have" believed Rose Jolliff's trial testimony. Schlup, 513 U.S. at 327, 115 S.Ct. 851. That is, it is more likely than not that any reasonable juror, conscientiously obeying the instructions of the trial court, would *955 have a reasonable doubt as to the credibility of Jolliff's trial testimony. Id., at 329, 115 S.Ct. 851. The record also contains substantial additional evidence that would further impeach Jolliff's credibility in the mind of any reasonable juror.

a. The Jolliff-Reasonover Tape

Petitioner and Jolliff were in custody at the Jennings Jail from January 7, 1983, at approximately 10:00 p.m., until the morning of January 8, 1983. (Trial Tr., at 673-74). See Reasonover, 714 S.W.2d at 711. On January 12, 1983, Jolliff called Petitioner on the telephone and part of the conversation was recorded by the police ("Jolliff-Reasonover Tape"). (Pet.Ex.37). The taped conversation is approximately ten minutes in length.[16] Petitioner's Exhibit 37 is an unenhanced copy of the Jolliff-Reasonover Tape.[17] Respondent does not dispute the authenticity of Petitioner's Exhibit 37. Because the tape is accurate recording of what was said, the Court finds that the tape is reliable evidence material to Petitioner's showing of actual innocence.[18]See Schlup, 513 U.S. at 324, 115 S.Ct. 851; Amrine, 128 F.3d at 1230.
Exhibit A to Petitioner's Post-Hearing Brief has been filed as a transcript of the Jolliff-Reasonover Tape. The Court finds that this transcript is an incomplete representation of the spoken words on the Jolliff-Reasonover Tape. The transcript is missing many significant words and phrases which the Court discovered after listening to the tape numerous times. The Court has created a complete transcript which represents every spoken word which can be understood on the Jolliff-Reasonover Tape.[19] (Appendix, Ex. A). The transcript created by the Court constitutes the Court's findings as to what Jolliff and Petitioner can be heard saying on the Jolliff-Reasonover Tape. (Id.). The Court has attached its transcript as Exhibit A to the Court's Appendix, and has attached the transcript submitted by Petitioner as Exhibit B to the Court's Appendix. (Appendix, Ex. A-B). The Court will rely on its transcript, see Appendix, Ex. A, in making factual findings and in drawing inferences from the Jolliff-Reasonover Tape.
The Court finds that the Jolliff-Reasonover Tape corroborates several of the statements made by Petitioner in the Reasonover-White Tape. First, Petitioner tells Jolliff that she was trying to help the police. (Appendix, Ex. A, at ___) (R: "I was pickin' out every motherfucker that I thought it coulda been, ya know, but see I was really trying to help they motherfuckin' ass." J: "Um-ham." R: "Ya know what I'm saying? And they pressuring me and shit.").[20] (Compare, Pet.Ex. 3, at 8, 10, 13-14).
Second, Petitioner says that the men she saw at the 7-Eleven may have been the same men she saw at the Vicker's station. (Appendix, Ex. A, at 982) (R: "When I had got up to the 7-Eleven, the niggers I has seen coming in looked like the nigger I had seen coming out that was goin' in the back when I was pulling up there." J: "Um-hm." R: "And, uh, what I was saying, it might not even coulda been them. It could have been some more niggers." J: "Um-hm." R: "You know what I'm saying? *956 That one just looks like it to me, ya know what I'm saying?"). Compare, Pet.Ex. 3, at 3, 8, 10, 33, 35. Compare also, Trial Tr., at 443 ("[W]hen I got up to the 7-Eleven, I was coming up to the store, they were going out of the store.") (statement by Petitioner on Sheila Hill Tape).
Third, Petitioner seems to say that she believes that the police suspect her in the Vicker's murder because they had previously accused her of committing a crime at a Vicker's station. ("So ya know I told you I had that other Vicker's thing back in '78 when I used to work there." J: "Uh-huh." R: "And they tried to put me in the penitentiary for 30 years." J: "Yeah." R: "They tripped off ____ I had the other Vicker's thing ____. They mighta thought ____."). Compare, Pet. Ex. 3, at 11, 16, 27, 32.
While corroborating several of Petitioner's statements, the Jolliff-Reasonover Tape fails to corroborate the details of Jolliff's trial testimony. In fact, Jolliff does not sound like someone who just days before heard Petitioner give a detailed confession to the murder. The Court finds significant the following exchange:
R: ________ Yeah, but what I can't understand is ____ why are they tryin' to stick me with something I didn't do?
J: I guess they figured you said something to someone in the cell.
(Appendix, Ex. A, at 983). Jolliff says that she believes that police "figured" Petitioner said "something to someone" in the cell. Jolliff does not say why the police "figured" this, she does not say what the "something" is, and she does not identify the "someone" to whom the police "figured" Petitioner spoke. Moreover, Jolliff seems to agree with the premise of Petitioner's question  that the police are trying to "stick" Petitioner with something that she didn't do. Jolliff says, "They makin', ya know, they tryin' to stick it to ya." (Appendix, Ex. A, at 982).
Jolliff portrays herself as Petitioner's ally, advising Petitioner, "[J]ust be cool ... watch what you're saying to whoever you're saying it too." (Appendix, Ex. A, at 982). See also, Id., at 983 ("[I]f you know your phone tapped, be cool."). Jolliff tells Petitioner not to worry about her, but tells Petitioner that she might want to "trip off of" the other woman who was in the cell. (Id., at 982). See also, Id., at 983 ("I don't know what that other broad is doing, but, ya know, be aware what's happenin'. Ya know, keep a low profile."). Petitioner tells Jolliff that she is not worried about the other woman in the cell, saying, "Well, if they do pick her up, then, uh, they ask her anything all she's gonna tell them is what I told her. That I ain't did shit. Because I didn't do nothin'." To this, Jolliff responds in the affirmative, "Umhm."[21]
Significantly, at no time does Petitioner mention anyone by the name of Robert McIntosh, or any nickname likely to be associated with the name of Robert McIntosh. Petitioner does not mention any details suggesting that she knows the specific manner in which James Buckley died; she does not mention that Buckley was shot seven times; she does not mention that a rifle was used; she does not mention who shot the gun. Petitioner never mentions any details suggesting that she knows what the intentions of the assailants were; she does not mention knowing that someone was supposed to distract the boy at the window; she does not mention that the boy was shot because he could identify the assailants. Thus, Jolliff's trial testimony, which was bereft of any reference to a telephone conversation with Petitioner, is wholly uncorroborated by the Jolliff-Reasonover Tape.
*957 The Court finds that the contents of the Jolliff-Reasonover Tape further discredit the trial testimony of Rose Jolliff. The Court concludes that the contents of the Jolliff-Reasonover Tape further strengthen the Court's conclusion that, in light of the new evidence, it is "more likely than not that no reasonable juror would have" believed Rose Jolliff's trial testimony. Schlup, 513 U.S. at 327, 115 S.Ct. 851.

b. The Understanding Between Jolliff and the State Which Resulted in the Unusually Favorable Disposition of Jolliff's Pending Cases

In September of 1982, Rose Jolliff was indicted by the St. Louis County Grand Jury on three felony counts of passing bad checks, account closed. (Pet.Ex.33). On December 20, 1982, Lawrence Mooney, a St. Louis County Prosecutor, recommended that, in exchange for a plea of guilty on all counts, Jolliff receive: 1) five years imprisonment to run concurrently: 2) a suspended execution of sentence ("SES"); 3) five years probation; 4) an order to make restitution; 5) an order to contribute $500.00 to a charitable fund; and 6) eighty-hours of alternative community service. Mooney wrote the recommendation in the court file under which he signed his initials. (Pet.Ex. 33; Mooney Test., O'Hagan Test.). Rose Jolliff's public defender, Stormy White, wrote the recommendation in her case file. (Pet.Ex. 8-D; Sto. White Test.).
In January of 1983, Steven Goldman, the prosecutor at Petitioner's trial, spoke with Rose Jolliff. (Goldman Test.). Goldman recalls speaking with Jolliff immediately after finding out about her from the police. (Goldman Test.). On June 1, 1983, Goldman called Stormy White. (Exhibit 8F; Sto. White Test.). Although Goldman and White have no specific recollection of this phone conversation, (Sto. White Test., Goldman Test.), White's records from her case file indicate that during the phone conversation Goldman mentioned "Rose Jolliff" and provided her with the name "Dan Chapman," the police officer who headed the investigation into the Vicker's murder. (Pet.Ex.8-F).
Goldman recalls speaking to Jolliff again prior to her deposition in South Bend, Indiana. (Goldman Test.). On August 12, 1983, Goldman took Jolliff's deposition in South Bend. (Resp. Hr'g Ex. D). At the deposition, Jolliff testified that Petitioner confessed to the Vicker's murder. (Id.). On August 15, 1983, Goldman called Stormy White. (Pet.Ex.8-G). White and Goldman have no specific recollection of this conversation. (Goldman Test., Sto. White Test.). Therefore, the Court will rely on the documents in Stormy White's case file in determining what was said during this conversation.
White made handwritten notes documenting the August 15, 1983 conversation with Goldman. As interpreted by White, the notes indicate that 1) Goldman took Jolliff's deposition, 2) Jolliff is scheduled to testify on October 24, 1983, 3) all warrants and National Criminal Information Center ("NCIC") notices have been cleared, 4) the plea should be done after trial, 5) Goldman will not burn her, and 6) the recommendation is still open. (Pet.Ex. 8-G; Sto. White Test.).
In preparation for a maternity leave, White dictated summaries of her case files for Rob Maurer, a public defender who was taking over White's caseload. (Sto. White Test.). These dictated summaries were typed by White's secretary and placed in the appropriate case file. (Id.). Petitioner's Exhibit 8-C is a typed summary relating to Rose Jolliff's case file. (Pet.Ex.8-C). The summary provides as follows:
Rose Jolliff is going to be a witness in a Capital Murder case that Steve Goldman is trying. Rose is apparently in Indiana. I have not talked to her in months. The state deposed her in Indiana and is going to pay for her expenses to testify in the trial, [sic] She will be coming in the week of the 24th. After she testifies she is going to plead guilty to this case and be given probation. The details of the *958 plea can be worked after she testifies. The state does not want to allow [Ellen Reasonover's][22] Defense Attorney to bring up any kind of deal that might have been made in Rose's case. I have been assured by Steve Goldman that the state isn't going to burn her, that she will receive probation.
(Pet.Ex.8-C).
On December 1, 1983, Jolliff testified against Petitioner. (Trial Tr., at 673, at 710; Pet.App. at 5). Later the same day, Jolliff pleaded guilty to her pending charges in exchange for six months bench probation, a suspended imposition of sentence ("SIS"), and a $26.00 payment to the State of Missouri. (Pet.Ex. 8-H through 8-K). At some point before the plea proceeding, the State's original recommendation was changed to six months bench probation with an SIS. (Pet.Ex.33).

i. The Disposition of Jolliff's Pending Cases was Unusually Favorable

The Court finds that the disposition of Jolliff's pending cases was unusually favorable, and significantly more favorable than the original recommendation made by the State. The State originally recommended that the Court impose, but suspend the execution of, a five year term of imprisonment. If Jolliff had received a SIS, the three felony convictions would have been added to her record, regardless of whether she violated probation. See Yale v. City of Independence, 846 S.W.2d 193, 195 (Mo. 1993) (en banc). By receiving an SIS, Jolliff was able to avoid any convictions so long as she did not violate her sixth month bench probation. Id. ("The obvious legislative purpose of the sentencing alternative of suspended imposition of sentence is to allow a defendant to avoid the stigma of a lifetime conviction and the punitive collateral consequences that follow.... [W]ith suspended imposition of sentence, trial judges have a tool for handling offenders worthy of the most lenient treatment.").
Furthermore, Jolliff's original recommendation called for a five years of standard probation, while the changed recommendation required only six months of bench probation. Thus, Petitioner ended up with a much shorter term of probation, and a less stringent form of probation. Standard probation is more stringent than bench probation because it requires the person on probation to be supervised by a probation officer who is required to report any violations to the sentencing court. See Mo.Rev.Stat. § 217.722. A person on bench probation is not actively supervised by anyone, and thus, violations are less likely to be brought to the attention of the sentencing court.
Arthur Margulis testified to the rarity of bench probation at the evidentiary hearing. Margulis, a criminal defense lawyer in St. Louis County for the past 30 years, testified that he had never known of a person with a criminal history comparable to Rose Jolliff's receiving bench probation on felony cases. (Margulis Test.). Sean O'Hagan, a St. Louis County Prosecutor from 1976 to 1985, testified that bench probation in a felony case was extremely unusual. (O'Hagan Test.). He testified that it would almost never happen unless there was some intervention from someone. (Id.). O'Hagan recalls recommending bench probation on a felony case on one occasion. (Id.). He recommended bench probation in that case at the request of the United States Attorney for the Eastern District of Missouri who had contacted him because the defendant was in the Federal Witness Protection Program. (Id.). Lawrence Mooney, a St. Louis County Prosecutor from 1976 to 1990, testified that it was rare to recommend bench probation on a felony case. (Mooney Test.).
In addition to receiving an SIS rather than an SES, and receiving six months bench probation rather than five years *959 standard probation, Jolliff received none of the additional penalties specified in the original recommendation. Jolliff was not required to make restitution, not required to pay a $500.00 contribution, and not required to perform 80 hours of community service. (Compare, Pet.Ex. 33 with Pet. Ex. 8-1 through 8-K).

ii. The Understanding Between Jolliff and the State

The Court finds that the disposition of Jolliff's pending cases resulted from an understanding between Jolliff and the State. The case summary dictated by Stormy White indicates that she had an understanding with Steven Goldman that Rose Jolliff would plead guilty after she testified against Petitioner, and that the "details of the plea" could be worked out after she testified. (Pet.Ex.8-C). The summary reflects White's understanding that the details of the plea would be worked out after Jolliff testified because Goldman did not want to allow Petitioner's counsel to "bring up any deal that might have been made in Rose's case." (Pet.Ex. 8-C). If there had been no understanding between Goldman and White, there would be no "details" to work out. Thus, the case summary is convincing proof of Goldman and White's understanding that Jolliff would receive a better disposition than that recommended by Lawrence Mooney if she testified against Petitioner.
The plain meaning of the case summary is bolstered by White's testimony at the evidentiary hearing. White testified that the St. Louis County Prosecutor's Office had a "common practice" of agreeing to "vague" understandings with cooperating witnesses. (Sto. White Test.). She testified that her conversation with Steven Goldman on August 15, 1983 reflected this practice. (Sto. White Test.; Pet.Ex. 8-G). White testified that whether she would recommend that her client testify as a State's witness based on a vague understanding depended on the reputation of the prosecutor with whom she was negotiating. (Sto. White Test.). White testified that Goldman was the type of prosecutor that would honor an understanding made with defense counsel. (Id.). She testified that she believes that this is, at least part of, what Goldman meant when he assured White that the State would not "burn" Jolliff. (Id.).
The Court also finds that the unusually favorable terms of the State's amended recommendation to Jolliff is evidence in itself that Jolliff testified in exchange for favorable treatment by the State. The only significant intervening change in the circumstances of Jolliff's pending cases between the time of the original recommendation and the time of the amended recommendation was Jolliff's testimony against Petitioner. Therefore, Jolliff's testimony against Petitioner is the only plausible explanation in the record before the Court for the State's amended recommendation.[23]
The Court finds that the understanding between Jolliff and the State which resulted in the unusually favorable disposition of Jolliff's pending cases further discredits the trial testimony of Rose Jolliff. The existence of this understanding further strengthens the Court's conclusion that, in light of the new evidence, it is "more likely than not that no reasonable juror would have" believed Rose Jolliff's trial testimony. Schlup, 513 U.S. at 327, 115 S.Ct. 851.

c. Jolliff's Invocation of the Fifth Amendment

At the evidentiary hearing, Jolliff invoked her Fifth Amendment privilege against self-incrimination in response to twenty-eight questions asked by Petitioner's counsel. (Jolliff Test.). The questions to which Jolliff invoked the Fifth Amendment include the following: 1) Were you involved in a police investigation concerning *960 a killing that occurred at the Vicker's service station? 2) Did Ellen Reasonover ever tell you anything about whether or not she killed or anyone else killed an individual named James Buckley? 3) Did Ms. Reasonover ever tell you that she killed anyone? 4) Did Ms. Reasonover ever tell you that she was present at the time the Vicker's service station was robbed? 5) Did Ms. Reasonover ever tell you whether or not she knew who had been involved in the killing at the Vicker's Service Station? 6) Did Ms. Reasonover ever identify anyone named Stanley White to you? 7) Did Ms. Reasonover ever identify anyone named Robert McIntosh to you? 8) Did you discuss with the prosecuting attorney in St. Louis County certain plea negotiations concerning disposition of your cases? 9) Did you discuss with the prosecuting attorney a disposition in which you would receive bench probation for those offenses? 10) Did you provide testimony in connection with Ellen Reasonover's case pursuant to plea negotiations that you had with the prosecuting attorney? 11) Was any testimony that you provided in the case involving Ms. Reasonover as a result of their agreement to dispose or dismiss your cases? 12) Did you lie when you testified in State of Missouri versus Ellen Reasonover? 13) Did you know that your testimony at the time that you were testifying was false? 14) Did the prosecuting attorney at any time ask you to lie in connection with your testimony? 15) Did any police officer ask you to lie in connection with your testimony? 16) Did the police provide you with information to use in your testimony against Ellen Reasonover? 17) Did the prosecuting attorney or anyone in his office provide you with information concerning testimony that might be used against Ellen Reasonover? 18) Did you receive any kind of financial reward or payment for your testimony against Ellen Reasonover? 19) Did anyone promise you any kind of financial reward or money or benefit of any kind for your testimony against Ellen Reasonover? 20) Did the prosecuting attorney, to the best of your knowledge, know that you were lying when you testified against Ellen Reasonover? 21) Did you tell him that you were willing to lie in connection with Ellen Reasonover? (Jolliff Test.).
"The normal rule in a criminal case is that no negative inference from the defendant's failure to testify is permitted." Mitchell v. United States, ___ U.S. ___, ___ _ ___, 119 S.Ct. 1307, 1314-15, 143 L.Ed.2d 424 (1999) (citing Griffin v. California, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). The law is, however, well settled that habeas corpus is a civil proceeding. Browder v. Dept. of Corrections of Illinois, 434 U.S. 257, 269, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978) (citing Fisher v. Baker, 203 U.S. 174, 181, 27 S.Ct. 135, 51 L.Ed. 142 (1906); Ex parte Tom Tong, 108 U.S. 556, 2 S.Ct. 871, 27 L.Ed. 826 (1883)). In Mitchell, the Supreme Court reaffirmed the "`prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" Mitchell, ___ U.S. at ___, 119 S.Ct. at 1315 (quoting Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). The Supreme Court explained the reasoning underlying this rule as follows:
In ordinary civil cases, the party confronted with the invocation of the privilege by the opposing side has no capacity to avoid it, say, by offering immunity from prosecution. The rule allowing invocation of the privilege, though at the risk of suffering an adverse inference or even a default, accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed. Another reason for treating civil and criminal cases differently is that `the stakes are higher' in criminal cases, where liberty or even life may be at stake, and where the Government's `sole interest is to convict.'
*961 Mitchell, ___ U.S. at ___, 119 S.Ct. at 1315 (quoting Baxter, 425 U.S., at 318-319, 96 S.Ct. 1551).
Because Rose Jolliff is not a party to this proceeding, drawing inferences from her silence "`implicates Fifth Amendment concerns to an even lesser degree.'" LiButti v. United States, 107 F.3d 110, 121 (2d Cir.1997) (quoting RAD Servs., Inc. v. Aetna Casualty & Sur. Co., 808 F.2d 271, 275 (3d Cir.1986)). Rose Jolliff comes before this Court with no stake in the proceeding; neither her life, liberty, nor property is at risk. Accordingly, the Court concludes that drawing inferences from Jolliff's silence will not offend Jolliff's Fifth Amendment privilege against self-incrimination.
The Court finds that Jolliff's testimony at the criminal trial is completely discredited when her invocation of the Fifth Amendment is considered in conjunction with the other evidence presented at the evidentiary hearing, including the Reasonover-White Tape, see supra, Discussion, Section III.A.1., the Jolliff-Reasonover Tape, see supra, Discussion Section III. A.2.a., and evidence establishing that Jolliff testified based on an understanding that she would receive favorable treatment from the State. See supra, Discussion, Section III.A.2.b. This adverse inference based upon her silence, coupled with the other new evidence, further strengthens the Court's conclusion that, in light of the new evidence, it is "more likely than not that no reasonable juror would have" believed Rose Jolliff's trial testimony.[24]Schlup, 513 U.S. at 327, 115 S.Ct. 851.

3. Evidence Impeaching the Credibility of Mary Ellen Lyner's Trial Testimony

At trial, the Petitioner's counsel offered substantial evidence impeaching the credibility of Mary Ellen Lyner.[25] Lyner admitted that she had been convicted of thirteen crimes  eight bad check charges, four stealing charges, and one misdemeanor assault. (Trial Tr., at 607). She admitted that twelve of these crimes were felonies. (Id., at 616). Lyner acknowledged that, in exchange for her testimony. Steven Goldman promised to recommend one year in jail on four pending forgery charges, and to recommend one year concurrent on the a pending "check charge" in the city. (Id., at 612).[26]
Although Lyner admitted entering into a deal with the State, she testified that this was the first time she had made a deal with a prosecutor to avoid serving time in a penitentiary. (Id., at 618). Lyner had previously testified before the grand jury on March 24, 1983 that she had never testified against anyone before, or made any kind of arrangement like the one that she made with Goldman relating to Petitioner's trial. (Resp. Hr'g Ex. B, at 22).
At the evidentiary hearing, Petitioner presented evidence tending to establish that Lyner had, on a prior occasion, made a deal with a prosecutor in exchange for favorable treatment on pending cases. On February 13, 1979, Lyner was found guilty of stealing and second degree burglary after she waived her right to a trial by jury and the charges were submitted to the trial judge on the police reports. (O'Hagan Test.; Goldman Test.; Pet.Ex. 34). The cause number in that case was *962 406883. (Pet.Ex.34). The trial judge ordered the State to conduct a presentence investigation and submit a report by March 16, 1979 in preparation for a June 29, 1979 sentencing date. (O'Hagan Test.; Pet.Ex. 34). The Court noted that, "If the defendant cooperates fully with the prosecuting authorities in this matter, then the State agrees to nolle-pros the above cause." (Pet.Ex.34).
On March 2, 1983, almost four years after the verdict rendered by the trial judge. Sean O'Hagan filed an order of nolle prosequi on Lyner's charges of stealing and second degree burglary. (Pet. Ex.34). An order of nolle prosequi is "an entry of record whereby the prosecutor indicates that he will proceed no further, terminates the proceedings and releases the defendant." State ex rel. Norwood v. Drumm, 691 S.W.2d 238, 239 (Mo.1985) (en banc) (citing State v. Berry, 298 S.W.2d 429 (Mo.1957); State v. Lawson, 630 S.W.2d 185 (Mo.App.1982)). An order of nolle prosequi results in the dismissal of the criminal charges. See Berry, 298 S.W.2d at 429. Thus, O'Hagan's order of nolle prosequi resulted in the dismissal of Lyner's stealing and second degree burglary charges, notwithstanding that Lyner had already been convicted of those offenses.[27]
There is ambiguity as to whether Lyner obtained the nolle prosequi order in exchange for her cooperation on the same case, cause number 406883, or in exchange for her testimony in a separate case known as the "Decker case." The Court observes that the trial court's order on February 13, 1979 indicates that the entry of nolle prosequi was contingent upon Lyner's cooperation with the prosecution in cause number 406883. (Pet.Ex.34). In addition, a letter from J.D. Evans, the First Assistant Prosecuting Attorney in St. Louis County, dated June 12, 1996 indicates that the entry of nolle prosequi was made in exchange for cooperation in cause number 406883. (Pet. Ex.44). After speaking with Frank Anzolone, Lyner's attorney in cause number 406883, Evans concluded: "Apparently, Ms. Lyner committed the offense in Cause Number 406883 at the instigation of her then paramour, and agreed to help in the investigation and prosecution of him in return for the eventual dismissal." (Pet. Ex.44).
There is also evidence, however, suggesting that Lyner received the entry of nolle prosequi in exchange for her testimony in the "Decker case." In the prosecutor's file, O'Hagan wrote that he had entered nolle prosequi because of lack of evidence ("L.O.E.") and "in exchange for testimony on Decker case." (Pet.Ex.34). In his testimony, O'Hagan acknowledged that the case could not have been dismissed because of lack of evidence, given that Lyner had already been found guilty of the charges.[28] O'Hagan testified that he believed the "Decker case" was a homicide case. (O'Hagan Test.). Steven Goldman testified that the "Decker case" was a case in which Walter Harvey and another individual were charged with kidnaping and murdering a couple with the last name "Decker." (Goldman Test.). Goldman prosecuted the "Decker case," but does not remember using Lyner as a cooperating witness. (Id.).
Whether Lyner received the entry of nolle prosequi in exchange for her cooperation in cause number 406883, or in exchange for her testimony in the Decker case, the evidence before this Court establishes that Lyner's cases were dismissed in exchange for a deal with the prosecution. This evidence could have been used to impeach Lyner's credibility at trial. Specifically, *963 the new evidence suggests that Lyner misrepresented herself, before the grand jury and at trial, when she said that the deal she made in exchange for her testimony was the first deal she had made with the prosecutor's office in exchange for favorable treatment.
Lyner's trial testimony is also called into question by contents of the Reasonover-White Tape and the Jolliff Reasonover Tape. See supra, Discussion Sections III. A.1. III.A.2.a. Petitioner's statements on these tapes tend to establish that Petitioner did not confess to Lyner. Based on the evidence impeaching Lyner's credibility at trial, the evidence that Lyner had on a prior occasion, made a deal with the State in exchange for favorable treatment, the evidence that Lyner misrepresented herself to the trial jury and the grand jury, and the contents of the Reasonover-White Tape and the Jolliff-Reasonover Tape, the Court concludes that it is "more likely than not that no reasonable juror would have" believed Mary Ellen Lyner's trial testimony. Schlup, 513 U.S. at 327, 115 S.Ct. 851.

4. Summary of the Court's Findings and Conclusions Based on Evidence Unavailable at the Time of Trial.

The Court concludes that, in light of the new evidence, it is "more likely that not that no reasonable juror would have" believed Rose Jolliff or Mary Ellen Lyner's trial testimony. Id., at 327, 115 S.Ct. 851. That is, it is more likely than not that any reasonable juror, conscientiously obeying the instructions of the trial court, would have a reasonable doubt as to both Jolliff and Lyner's trial testimony. Id., at 329, 115 S.Ct. 851. Because the State's case against Petitioner was based almost entirely on the testimony of Rose Jolliff and Mary Ellen Lyner, the Court concludes that in light of the new evidence, it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id., at 327, 115 S.Ct. 851. The Court finds that Petitioner has presented new evidence of innocence "so strong that [the] court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Id., at 316, 115 S.Ct. 851. See also, Id., at 317, 115 S.Ct. 851 ("If the habeas court were merely convinced that the new facts raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error, Schlup's threshold showing of innocence would justify a review of the merits of the constitutional claims."). Because failure to review the merits of Petitioner's claims would result in a fundamental miscarriage of justice, the Court concludes that Petitioner may pass through the Schlup gateway and have her constitutional claims reviewed on the merits.
The Court notes that its finding that Rose Jolliff's testimony is not worthy of belief, and would not be believed by any reasonable juror, is sufficient to satisfy the Schlup standard. Jolliff's testimony was the linchpin of the State's case. Without Jolliff's testimony, the in-court identifications of Stanley White and Robert McIntosh become completely irrelevant to Petitioner's guilt or innocence. The identifications of White and McIntosh incriminated Petitioner only to the extent they corroborated the testimony of Rose Jolliff. With Jolliff's testimony rendered unworthy of belief, no evidence connects Petitioner with White on the night of the murder and no evidence establishes that Petitioner knew or associated with someone named Robert McIntosh. Without Jolliff's testimony, the State's evidence that the victim was shot seven times with a rifle fails to incriminate Petitioner. The evidence that there was money stolen from the Vicker's station also fails to incriminate Petitioner. Although the State was not required to prove motive, Jolliff's testimony provided the only evidence of motive  that Petitioner killed Buckley because he could identify her.
When Jolliff's testimony is removed from the State's case, the State is left only *964 with Petitioner's alleged confession to Mary Ellen Lyner, which lacks the detail of the confession allegedly made to Rose Jolliff. See Reasonover, 714 S.W.2d at 712 ("[D]efendant ... specifically admitted to Rose Jolliff and generally admitted to Mary Ellen Lyner that she committed the offense."). Lyner's testimony, therefore, was not as incriminating and was not corroborated by other evidence at trial. Lyner was also not as credible as Jolliff because Lyner had a more substantial criminal record and Lyner admitted that she was testifying in exchange for a favorable recommendation on her pending cases. Indeed, the State's closing argument demonstrates that it was relying more heavily upon Jolliff's testimony than upon Lyner's:
[Mary Ellen Lyner] didn't deny getting a deal. She got one year. That's the most she ever got even before with all these eighteen convictions, or whatever she had, she got a year in jail. Mary Ellen Lyner, as bad as they try to make her become, that's the most she ever got....
....
Rose Jolliff is completely different. Rose doesn't have a reason in the world to by lying.... [S]he has absolutely no reason to make any of this stuff up, absolutely none, and what she says is just  the details she gives show you she is telling the truth, even more so than Mary Ellen Lyner.... I mean the guy was distracted at the window, that's exactly what was going on, by Stanley White and Robert McIntosh and there is no way Rose Jolliff isn't telling you exactly the truth in this case. The identifications, what they do, is corroborated here and she gives the names of the same two people who have been identified.
(Trial Tr., at 839-41).
Although the existence of Lyner's trial testimony may amount to sufficient evidence upon which a reasonable jury could have convicted Petitioner of capital murder, see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), a habeas court, under Schlup, must consider "what reasonable triers of fact are likely to do." Schlup, 513 U.S. at 330, 115 S.Ct. 851 ("Though under Jackson the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under Carrier."). The Court concludes that, Rose Jolliff's trial testimony having been discredited, it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id., at 327, 115 S.Ct. 851.

B. Evidence Not Presented at Trial

In the previous section, the Court discussed reliable evidence presented at the evidentiary hearing that is "new" within the meaning of the Eighth Circuit's decision in Amrine because it was "not available at trial and could not have been discovered earlier through the exercise of due diligence." Amrine, 128 F.3d at 1230. See, infra, Discussion, Section IV.A. In this section, the Court will discuss reliable evidence presented at the evidentiary hearing which was available, but not presented during Petitioner's trial. Though not essential to Petitioner's showing of actual innocence, the Court will discuss this evidence to complete the record and because the Schlup opinion suggests that a habeas court must consider reliable evidence of actual innocence, irrespective of whether that evidence was available at the time of trial. See supra, Discussion, Section II.

1. Marquita (Butler) Hinton's Testimony

Marquita Hinton, formerly Marquita Butler, was the other person in the Jennings Jail cell with Petitioner and Rose Jolliff on January 8, 1983. (Hinton Test.; Pet.Ex. 26). Jolliff testified that, while Petitioner gave her detailed confession to the murder, Marquita Butler was sitting on the "next bunk." (Trial Tr., at 679, 690, 693-94). Marquita Hinton did not testify at trial.
*965 At the evidentiary hearing, Hinton testified that the jail cell she occupied with Rose Jolliff and Petitioner was small, and that, if one occupant was speaking, the other occupants could hear what was being said. (Hinton Test.). Hinton testified that she never heard Petitioner say that she was involved in the Vicker's murder. (Id.). Hinton testified that she heard Petitioner talking to Jolliff, but they only were engaged in "girl talk." (Id.). Hinton testified that, at some point, she went to sleep. (Id.). When she awoke, Petitioner was gone and so was Jolliff. (Id.). Later in the morning, Hinton saw Jolliff return to the cell with donuts. (Id.). Hinton, who had been in the Jennings Jail before, thought it unusual that an inmate would be given donuts. (Id.).
Hinton was released on January 9, 1983. (Hinton Test.). Shortly thereafter, she met with authorities at the St. Louis County Prosecutor's Office. (Hinton Test., Pet. Ex. 26, at 1054, 1060-61). On January 13, 1983, Hinton was contacted by Captain Dan Chapman, who headed the investigation into the Vicker's murder. (Hinton Test.; Pet.Ex. 26). Hinton recalls that Chapman offered her money if she would say that Petitioner confessed to the Vicker's murder. (Hinton Test.).
Hinton testified that, at the time, she was a drug abuser and was "broke." (Id.). She testified that the police told her that they could "lock her back up" if she did not cooperate. (Id.). Hinton testified that, at first, she pretended that Petitioner had confessed to her. (Hinton Test.). The police gave her details to use in her statement, such as the names of Stanley White and Robert McIntosh. (Hinton Test.). In the end, Hinton refused to give statements to the police which incriminated Petitioner. (Hinton Test.). She decided it was wrong to provide false information to the police. (Id.).
The police taped part of Chapman's conversation with Hinton on January 13, 1983. (Pet.Ex.26). Petitioner's Exhibit 26 is a transcript of that tape created by the Dellwood Police Department. (Id.). The transcript corroborates Hinton's testimony in several respects. First, the transcript corroborates Hinton's testimony that Chapman offered Hinton money in exchange for a written statement. (Pet.Ex. 26, at 1063) (Chapman: "Okay, now this is the way that it will go down now. We're going to have to have you come and put it in writing, what happened, and we'll give you $150.00. If you put it in writing."). (See also, Pet.Ex. 26, at 1066-67, 1070-71). Second, the transcript corroborates Hinton's testimony that Chapman threatened to arrest Hinton if she did not cooperate. When Hinton's boyfriend got on the phone, the following exchange ensued:
Chapman: She hasn't cooperated with us ... Now let me explain it the way it is. We can arrest her as a witness in this case.
Boyfriend: She still will say she don't know nothing.
Chapman: That way.
Boyfriend: You're going to arrest her, and they'll have to turn her loose in 20 hours.
Chapman: Well, we can arrest her and hold her as a witness. We're not going to do it that way. It's just like I explained to her. She says she knows more information, that was said in the cell, you know. If she wants to tell us what it is, you know, we'll give her $150.00. I'll guarantee that. I'm in charge of the investigation. I'm the Captain.
(Pet.Ex. 26, at 1069). Third, the transcript corroborates Hinton's testimony that the police gave her details to use in a statement which would have incriminated Petitioner:
Chapman: Did she tell you the guy's name that did it?
Marquita: No. It was just her boyfriend.
Chapman: Her boyfriend did it. Was there anybody else with them?
Marquita: Some other dude was with them, but I don't know.
Chapman: You don't know his name?

*966 Marquita: No
Chapman: Did she mention it? Would you know it if I told you?
Marquita: Well, they already mentioned some of the names to me that the dudes supposed to be doing it.
Chapman: Okay, Robert McIntosh was he one of them?
Marquita: Yea, that was one of them.
Chapman: Is he the one who did the shooting?
Marquita: Uh, Uh, I think like the one that did it was supposed to have been him, and then there was this other dude named Stan. But they say this one named Stan was supposed to be her boyfriend.
Chapman: Stanley?
Marquita: Yea, and the other one was supposed to be her pimp.
Chapman: Her pimp. Stanley White is one. Did she mention that name?
Marquita: Uh, yea.
Chapman: Okay, and Robert McIntosh is the pimp.
Marquita: Yea. But that's what confused me right there when I was telling them about it. When I was saying well she said her boyfriend did it, you know. Both of them were men, how I know which one?
(Pet.Ex. 26, at 1063-64) (emphasis added). See also, Id., at 1073.
The Court finds that Hinton was a credible witness. The Court further finds that Hinton's testimony on several material points is corroborated by the transcript of the conversation between Chapman and Hinton. The Court believes that this evidence further impeaches the trial testimony of Rose Jolliff. Jolliff testified that Hinton was "sitting" on the bed in the "next bunk" when Petitioner confessed. But Hinton testified that Petitioner never said anything to suggest that she was involved in the Vicker's murder.
Furthermore, Hinton's credible account of how the police treated her is significant in light of the fact that Jolliff was dealing with the same officers at the same point in the investigation. See e.g., Pet.Ex. 37 (police taped Jolliff's conversation with Petitioner on January 12, 1983). The evidence indicates that the police threatened to arrest Jolliff, see Appendix, Exhibit A, at 981, just as they threatened to arrest Hinton. (Pet.Ex. 26, at 1069). When considered with the other evidence impeaching Jolliff's trial testimony. Hinton's testimony is strong evidence suggesting that Jolliff was given incriminating details to use in her testimony against Petitioner, such as the names of Stanley White and Robert McIntosh. Hinton's testimony also suggests that the police may have promised, or given, Jolliff money in exchange for her testimony. The Court concludes that Marquita Hinton's testimony further strengthens the Court's conclusion that, in view of the new evidence, it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id., at 327.

2. Testimony of Petitioner and Lyner's Cellmates

Mary Ellen Lyner testified that Carol Coates, Rose Winston, and Elaine Carpenter were the other women in the St. Louis County Courthouse "holdover" when Petitioner confessed to the Vicker's murder on February 9, 1983. (Trial Tr., at 608). She testified that the holdover was approximately "15 feet deep and 8 feet wide." (Id.). Neither Coates, Winston, nor Carpenter testified at trial.
At the evidentiary hearing, Carolyn Coats and Rose Winston testified. Carolyn Coates, now Carolyn Tucker, and Rose Winston, now Rose Winston Todd, recalled being incarcerated with Petitioner in February of 1983. (Tucker Test., Winston Todd Test.). Both witnesses testified that Petitioner never said anything suggesting that she was involved in the Vicker's murder. (Id.). The Court finds that Tucker and Winston Todd were credible witnesses who had no reason to testify falsely on behalf of Petitioner. Neither woman has had any contact with Petitioner since the time they were incarcerated with her. (Tucker Test., Winston Todd Test.).
*967 Because Tucker and Winston Todd were in close proximity to Lyner and Petitioner when Petitioner allegedly confessed to Lyner, the Court finds that Tucker and Winston Todd's testimony further impeaches Mary Ellen Lyner's trial testimony. The Court concludes that Tucker and Winston Todd's testimony further strengthens the Court's conclusion that, in view of the new evidence, it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id., at 327.

3. Petitioner's Testimony

During the guilt phase of her trial, Petitioner exercised her Fifth Amendment right to remain silent. At the penalty phase, however, Petitioner testified that the jury should not sentence her to death because she was innocent. (Trial Tr., at 913-14). She further testified that Stanley White was a former boyfriend she had not seen since he broke her car windows, and that Robert McIntosh was someone she had not seen since the eighth grade. (Trial Tr., 913-14, 924-25).
At the evidentiary hearing, Petitioner testified in detail as to the material facts surrounding her conviction for capital murder. (Reasonover Test.). Petitioner's testified that she went to the laundromat on the night of the murder. (Id). Petitioner typically went to the laundromat at night because she could leave her two-year old daughter with her mother while her daughter slept. (Id.). Petitioner took about six or seven army bags full of laundry. (Id.). After doing laundry for about an hour and a half, Petitioner ran out of change. (Id.). She remembers that she still had a load of "reds" that needed both washing and drying. (Id.). Petitioner decided to leave the laundromat to get change and some cigarettes. (Id.).
Petitioner testified that she left the laundromat originally intending to go to the 7-Eleven. (Id.). Because of the layout of the intersection, however, Petitioner stayed to the right and went to the Vicker's station. (Id.). At the Vicker's station, Petitioner parked her car and saw a light-skinned black male at the cashier's window wearing a red and white fishing and hunting shirt and a red and white cap. (Id.). As she walked toward the cashier's window. Petitioner saw the man turn around, take of his hat, and walk into a back room. (Id.). Petitioner knocked on the window three or four times in an attempt to get service. (Id.). Unable to get service. Petitioner got in her car and decided to drive to the 7-Eleven. (Id.). On her way out of the Vicker's lot, Petitioner saw another man coming out of the side door of the Vicker's station. (Id.).
Petitioner testified that she drove to the 7-Eleven and got change and some cigarettes. (Id.). On her way out the door, she saw a man who looked like the light-skinned black male that she had seen at the cashier's window, and a man who with an army jacket who looked like the man she saw coming out of the side door of the Vicker's station. (Id.). The man with the army jacket had bloodshot eyes, and was taller and darker in complexion than the light-skinned man. (Id.). Petitioner saw a figure sitting in the back seat of the car from which the two men exited, but could not tell whether the figure was a man or a woman. (Id.).
Petitioner testified that she returned to the laundromat, washed and dried her load of "reds," and returned home after about forty-five minutes. (Id.). Petitioner took the clean laundry into the house, making about six trips from the car to the second floor apartment. (Id.). Petitioner went to bed at about three in the morning. (Id.). The next day, Petitioner saw something about a murder at Vicker's "flash" across the television screen. (Id.). Petitioner's mother, a frequent customer at the Vicker's station, encouraged Petitioner to tell the police what she had seen the previous night. (Id.). Petitioner spoke with several police officers before eventually getting in touch with Captain Dan Chapman. (Id.).
Without informing Petitioner, Chapman recorded his conversation with Petitioner, who identified herself as "Sheila Hill." (Trial Tr., at 442-472). See Pet.Ex. 24. *968 Petitioner testified that she does not know why she gave the name Sheila Hill, but she just really didn't want to give her own name. (Reasonover Test.). Petitioner testified, and the contents of the Sheila Hill Tape reflect, that she was afraid to be involved as a witness in a murder case. (Reasonover Test.; Trial Tr., at 443-444, 471). The Sheila Hill Tape was played at the evidentiary hearing, and Petitioner confirmed that she was, in fact, the female voice on the tape. (Reasonover Test.).
At the request of Chapman, Petitioner came down to the station to look at some photographs. (Reasonover Test.). Petitioner testified that she told Chapman that she could not clearly identify either man that she saw. (Id.). According to Petitioner. Chapman told her to pick any pictures in which the nose, eyes, mouth or complexion looked familiar. (Id.). Chapman told Petitioner to write "positively" on the back of any pictures she selected. (Id.). Chapman told Petitioner that this was "just for the record," and that the police were just going to "run a check" on anyone she identified. (Id.). Petitioner remembers that Chapman told her how to spell "positively" because she didn't know how to spell it. (Id.). Petitioner testified that she picked out about thirty pictures of men who looked similar to the men she saw at the Vicker's station and the 7-Eleven. (Id.). In subsequent days, Petitioner viewed several live-lineups. (Id.). Petitioner identified some "light skinned guys" and some "tall brown-skinned guys," but told the police that she wasn't positive and that she was concerned about sending an innocent person to prison. (Id.). The police encouraged Petitioner to "pick them out anyway." (Id.). Petitioner testified that she identified Willie Love because she thought he resembled the "light skinned" man she saw at the cashier's window. (Id.). Petitioner testified that, at all times, she was trying to help the police and follow their instructions. (Id.). Petitioner denied ever threatening any police officers. (Id.).
Petitioner recalls being locked up at the Dellwood Jail next to Stanley White. (Id.). She did not know that their conversation was being recorded. (Id.). Petitioner recalls being locked up with Rose Jolliff and Marquita Butler on that same night. (Id.). She does not remember talking to either of them. (Id.). Petitioner recalls one of the women from the cell calling her on the telephone a few days later. (Id.). She did not know that the telephone conversation was being tape recorded. (Id.).
Petitioner testified that she remembers being in a holding cell and in the St. Louis County Jail with Mary Ellen Lyner. (Id.). She stated that she typically did not talk to Lyner because Lyner was older in age. (Id.). On one occasion, however, she spoke to Lyner and told her that she was in jail for something she didn't do. (Id.). Lyner told Petitioner that if she believed in God, everything would turn out okay. (Id.).
Petitioner testified that she was not involved in the Vicker's murder. (Id.). She testified that she had not seen Stanley White since he broke out the windows of her car on or about December 27, 1982. (Id.). She remembers that the glass-breaking incident with Stanley White occurred on or about December 27 because that is the date of her daughter's birthday. (Id.). She testified that she had not seen Robert McIntosh since the ninth grade. (Id.). To the best of her knowledge, Stanley White and Robert McIntosh do not know each other. (Id.).
The Court finds that Petitioner was a credible witness. Petitioner's testimony as to what she did and saw on the night of the murder is consistent in all material respects to her statements on the Sheila Hill Tape  recorded on January 4, 1983, the Reasonover-White Tape  recorded on January 7, 1983, and the Jolliff-Reasonover Tape  recorded on January 12, 1983.[29] Furthermore, Petitioner's testimony as to her attempts to help the police is consistent with her statements on the Reasonover-White *969 Tape and the Jolliff-Reasonover Tape. Petitioner's testimony further undermines the Court's confidence in the outcome of Petitioner's trial and strengthens the Court's conclusion that, in light of the new evidence, it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327, 115 S.Ct. 851.

4. The Suppression Hearing Testimony of Officer Marsha Vogt

On February 25, 1983, Steven Goldman contacted Officer Marsha Vogt and directed her to go undercover and pretend that she was a prisoner while in a jail cell with Petitioner. (Suppression Hr'g Test., at 93). Vogt was instructed not to initiate the conversation in any way. (Id., at 93). At some point. Captain Chapman and another police officer took Petitioner out of the cell and served her with the grand jury indictment charging her with capital murder. (Id., at 94, 97). Petitioner was then brought back into the cell where she made unsolicited statements to Vogt. (Id., at 95). Vogt testified that she secretly recorded these statements, but the tape was "all muffled." (Id.).
Vogt testified that Petitioner denied being involved in the murder. (Id., at 95), and paraphrased Petitioner's statements as follows:
[T]hey have not [sic] witnesses, they're trying to say I killed a great big guy; how could I do that?, and that her mother was the one that told her to call the police; and she went to the Vicker's  or she knew what time it was, it was around 1:30, and she went to a laundromat, and she went to a Vicker's station to buy some cigarettes and she saw them in there, but she didn't know who they were, and they then followed her to a 7-11 store but she didn't know who they were.
(Id., at 98). Vogt did not testify as a witness at trial.
Petitioner's statements to Vogt are consistent in all material respects to Petitioner's testimony and to Petitioner's statements on the Sheila Hill Tape, the Reasonover-White Tape, and the Jolliff-Reasonover Tape.[30] Petitioner's statements to Vogt are particularly trustworthy because Petitioner did not know Vogt was a police officer and because Petitioner's statements were uttered just after Petitioner was served with an indictment for capital murder. In addition, as a police officer involved in the investigation, Vogt had no motive to paraphrase Petitioner's statements in a manner favorable to Petitioner. The Court concludes that Officer Vogt's testimony from the suppression hearing is further evidence which strengthens the Court's conclusion that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327, 115 S.Ct. 851.

5. Stanley White's Alibi

At trial, the only evidence the jury heard regarding the whereabouts of Stanley White on the night of the murder was the testimony of Kenneth Main. (Trial Tr., at 644-672). On January 7, 1983, Main identified Stanley White as the black male he had seen at the Vicker's station at about 1:45 a.m. on January 2, 1983. (Id., at 656). Prior to identifying White, Main's memory had been refreshed through hypnosis administered by a psychiatrist with whom the State contracted.[31] (Id., at 653). *970 Main's testimony corroborated Rose Jolliff's testimony because Jolliff testified that Petitioner admitted committing the murder with Stanley White.
At the evidentiary hearing, Stanley White testified that, in late-1982 and 1983 from the Christmas holiday until several days after the New Year, he was staying at the Weston residence with Dale, Addie, Joe and Woodrow Weston. (Sta. White Test.). White testified that he was at the Weston residence at the time of the Vicker's murder. (Id.). White's testimony is consistent with what he told Officer Robert Pruett on January 6, 1983. (Pet.App. 1025-1030). White's testimony is also consistent with White's statements on the Reasonover-White Tape in which White states that he was staying at the house of someone named "Woody"  a common nickname for Woodrow  since the Tuesday before the murder and that he was at "Woody's" house at the time of the murder. (Pet.Ex. 3, at 6-7, 19-20, 24, 31).
Woodrow Weston testified that he remembers Stanley White being at his house in 1983 on New Year's Eve night and New Year's Day night  the night of the Vicker's murder. (W. Weston Test.). He recalls going over to Tommy Navies' party across the street with White on New Year's Eve night, and recalls White sleeping over on New Year's Day night. (Id.). Woodrow Weston testified that he was never questioned by the police as to Stanley White's whereabouts, but remembers the police questioning his mother, Addie Weston. (Id.).
Dale Weston's memory of White's whereabouts was the same as Woodrow Weston's. Dale Weston testified that White stayed at the Weston residence in 1983 on New Year's Eve Night and New Year's Day night. (D. Weston Test.). Dale Weston testified that he was interviewed by the police at the same time as his father, Joe Weston, his mother, Addie Weston, his brother, Ronnie Weston, and Ronnie Weston's girlfriend. (Id.). Dale Weston testified that he, and all the others who were interviewed, told the police that Stanley White was at the Weston residence through the night of January 1, 1983 and into the early morning hours. (Id.).
Officer Robert Pruett testified that he did not have an independent recollection of interviewing the Westons on January 6, 1983. (Pruett Test.). Pruett relied on his report of the interview in testifying before the Court. (Id). In his report. Pruett indicated that Addie Weston and Dale ("Dell") Weston stated that Stanley White had not been at the Weston residence since December 24, 1982. (Pet.App.1028-29), Pruett spoke with Tommy Navies who stated that he had a party on New Years Eve night, but did not know anyone by the name of Stanley White. (Id., at 1029).
The Court finds Stanley "White's testimony to be credible, as it is consistent with his statements to Officer Pruett on January 6, 1983 and consistent with his statements on the Reasonover-White Tape." The Court also finds that Woodrow and Dale Weston's testimony to be credible. Although Woodrow and Dale Weston are long-time friends of Stanley White, they have no personal relationship with Petitioner, and therefore have no motivation to lie in this proceeding. (W. Weston Test.; D. Weston Test.). Although White's testimony and the Weston brothers' testimony is called into question by Officer Pruett's report, the Court finds that this testimony is sufficiently reliable to further undermine the Court's confidence in the outcome of Petitioner's trial. The State's theory at trial was that Petitioner committed the murder with Stanley White and Robert McIntosh.[32] Therefore, the testimony of Stanley White, Woodrow Weston, and Dale Weston  which tends to establish that White was at the Weston residence at the time of the murder  further strengthens the Court's conclusion that it is "more *971 likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327, 115 S.Ct. 851.

6. Witnesses Testifying to Jolliff and Lyner's Character for Untruthfulness

Arthur Greenwood testified that he knew Rose Jolliff during the time that she testified against Petitioner. (Greenwood Test.). Jolliff is married to Greenwood's uncle. (Id.). Greenwood also knows Jolliff by the names of Carol Jolliff, Carol Johnson, and Rose Johnson. (Id.). Greenwood testified that he spent time with Jolliff at social and family gatherings, and was familiar with her reputation for untruthfulness. (Id.). He testified that Jolliff is known as a liar, and that she would he in court before she would go to jail. (Id.). See, Fed.R.Evid. 608(a) ("The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but ... the evidence may refer only to character for truthfulness or untruthfulness."). The State did not present any witnesses challenging Greenwood's opinion as to Jolliff's character for untruthfulness.
Virginia Druhe testified that she and Mary Ellen Lyner were close friends at the time Lyner testified against Petitioner. (Druhe Test.). Druhe testified that she always called Lyner by her nickname. "Tell." (Id.). Druhe testified that, although she could personally trust Lyner because of their close friendship, Lyner was a drug abuser who would commonly deceive people including her own family. (Id.). Druhe testified that she believes that Lyner was capable of lying in court if lying would benefit Lyner in some way. (Id.). The State did not present any witnesses challenging Druhe's opinion as to Lyner's character for untruthfulness.
The testimony of Greenwood and Druhe tends to establish that Jolliff and Lyner were untruthful individuals who would lie in court if lying would be to their benefit. The Court finds the testimony of these witnesses to be credible. Greenwood is a relative of Jolliff's and Druhe was a close friend of Lyner's. In addition, there is no evidence that either witness has ever had a personal relationship with Petitioner. Thus, the Court finds that neither witness had any motive to testify falsely. In light of the other evidence impeaching the credibility of Jolliff and Lyner's trial testimony. Greenwood and Druhe's testimony further undermines the Court's confidence in the outcome of Petitioner's trial. The Court concludes that this testimony further strengthens the Court's conclusion that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327, 115 S.Ct. 851.

7. Petitioner's Polygraph Examination

Gary Davis, a forensic polygraph examiner, testified at the evidentiary hearing. (G. Davis Test.). Based on Davis' education, experience, associations, and publications, the Court finds that Davis is an expert polygraph examiner. (G. Davis Test.; Pet.Ex. 21). Upon consideration of Davis' testimony, the Court finds that the specific polygraph testing conducted by Davis is sufficiently reliable to be considered by the Court in this matter. See Schlup, 513 U.S. at 327, 115 S.Ct. 851 ("[T]he district court is not bound by the rules of admissibility that would govern at trial.").
Davis gave Petitioner a polygraph examination on June 30, 1998. (Davis Test.; Pet.Ex. 19-20). Davis asked Petitioner the following questions: 1) Did you participate in the robbery of the Vicker's Station; 2) Did you shoot James Buckley; 3) Do you know for sure who robbed the Vicker's station? (Id.). Petitioner answered "no" to each of these questions. (Id.). Davis testified that is it his opinion, based on the results of the examination, that Petitioner answered the questions truthfully. (Id.). The Court finds that Davis' testimony bolsters the credibility of Petitioner's testimony. However, the Court emphasizes that *972 it finds Petitioner's testimony to credible and believable even in the absence of Davis' testimony. See Schlup, 912 F.Supp. at 455 (court found that reliable polygraph testimony bolstered the credibility of an already believable witness). Davis' testimony further undermines the Court's confidence in the outcome of Petitioner's trial.

IV. The Merits of Petitioner's Constitutional Claims

A state prisoner may petition for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A state prisoner is entitled "to relief on federal habeas corpus only upon proving that [his] detention violates ... fundamental liberties ... safeguarded against state action by the Federal Constitution." Wessling v. Bennett, 410 F.2d 205, 209 (8th Cir.1969) (quoting Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). "`[I]t is not the province of a federal habeas court to re-examine state-court determinations of state-law questions,'" Gee v. Groose, 110 F.3d 1346, 1349 (8th Cir.1997) (quoting Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). Rather, a federal court is limited "`to deciding whether a conviction violates the Constitution, laws or treaties of the United States.'"[33]Id.
In Ground I through Ground V of her First Amended Petition. Petitioner claims that her rights under the Due Process Clause were violated when the State failed to disclose evidence favorable to Petitioner. (First Amended Petition, at 63-93; Docket # 96, 103). Specifically, Petitioner claims, inter alia, that her rights under the Due Process Clause were violated when the State failed to disclose the Reasonover-White Tape, the Jolliff-Reasonover Tape, evidence of a deal between Rose Jolliff and the State, and evidence that Mary Ellen Lyner had, on a prior occasion, made a deal with the prosecution in exchange for favorable treatment. (Id.). In support of these constitutional claims. Petitioner relies on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and subsequent cases interpreting that decision.
Recently, the Supreme Court summarized the "essential components of a Brady violation" as follows:
In Brady this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S., at 87, 83 S.Ct. 1194. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused. United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id., at 682, 105 S.Ct. 3375; see also Kyles v. Whitley, 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." Id., at 438, 115 S.Ct. 1555. In *973 order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles, 514 U.S., at 437, 115 S.Ct. 1555.
These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest; therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust. Thus the term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence  that is, to any suppression of so-called "Brady material"  although, strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
Strickler v. Greene, ___ U.S. ___, ___, 119 S.Ct. 1936, 1948, ___ L.Ed.2d ___, ___ (1999) (internal footnotes omitted).

A. The State's Failure to Disclose Evidence Favorable to Petitioner

1. Failure to Disclose the Reasonover-White Tape

The Reasonover-White Tape is "Brady material" because it tends to establish that Petitioner did not commit the Vicker's murder, and because it impeaches the trial testimony of Rose Jolliff and Mary Ellen Lyner. See Discussion. Section III.A. Steven Goldman, the prosecutor at Petitioner trial, admits that he did not inform Petitioner's counsel of the existence of the Reasonover-White Tape. (Goldman Test.). The State first disclosed the Reasonover-White Tape on February 26, 1996. (Pet.App.893-94, 899-900, 913-14). Because the Reasonover-White Tape was created by police investigators, Goldman had a duty to find out about the tape and to disclose it to Petitioner's trial counsel. See Strickler, 119 S.Ct. at 1948.

2. Failure to Disclose the Jolliff-Reasonover Tape

The Jolliff-Reasonover Tape is Brady material because it tends to establish that Petitioner did not commit the Vicker's murder, and because it impeaches the trial testimony of Rose Jolliff and Mary Ellen Lyner. See Discussion, Section III.A. Steven Goldman admits that he did not inform Petitioner's counsel of the existence of the Jolliff-Reasonover Tape. (Goldman Test.). The State first disclosed the Jolliff-Reasonover Tape on June 29, 1999  after the close of the second day of the evidentiary hearing. (June 30, 1999 Tr., Morning Session). Because the Jolliff-Reasonover Tape was created by police investigators, Goldman had a duty to find out about the tape and to disclose it to Petitioner's trial counsel. See Strickler, 119 S.Ct. at 1948.

3. Failure to Disclose the Existence of the Understanding Between Jolliff and the State

As discussed supra, see Discussion Section III.A.2.b., there was an understanding between Jolliff and State *974 that Jolliff would receive favorable treatment on her pending cases in exchange for her testimony. Goldman's understanding with Jolliff and her appointed counsel included an agreement to work out the specifics of the deal after Jolliff testified so that Petitioner's trial counsel could not "bring up any deal that might have been made in Rose's case." (Pet.Ex. 8-C). The understanding between Jolliff and the State is Brady material because it impeaches the trial testimony of Rose Jolliff, and thus tends to establish that Petitioner did not commit the Vicker's murder.
Under the Brady rule, a prosecutor has a constitutional duty to disclose "evidence of any understanding or agreement as to future prosecution" relating to any of its witnesses. Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). This constitutional duty takes on added importance where the "`reliability of a given witness may well be determinative of guilt or innocence.'" Id., at 154, 92 S.Ct. 763 (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). A prosecutor cannot insulate a witness from cross-examination by leaving out the details of a plea agreement. See Giglio, 405 U.S. at 153-154 n. 4, 92 S.Ct. 763. Rather, a prosecutor must disclose "evidence of any understanding or agreement as to future prosecution." Id., at 154-55, 92 S.Ct. 763 (emphasis added). See also, Brown v. Wainwright, 785 F.2d 1457, 1464-65 (11th Cir.1986) ("Giglio does not require that the word "promise" is a word that must be specifically employed. ... It is a constitution we deal with, not semantics. `The thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony.'") (quoting Smith v. Kemp, 715 F.2d 1459, 1467 (11th Cir.1983)).
Goldman did not disclose evidence of the understanding between Jolliff and the State based on his asserted belief that there was no "deal" to disclose. (Goldman Test.). Madeline Franklin testified that Jolliff's testimony at trial  that she was never promised "any kind of recommendation" in exchange for her testimony, see Trial Tr., at 701  was consistent with the information the State had communicated to her at the time of trial. (M. Franklin Test.). Goldman had a constitutional duty under Brady and Giglio, to inform Petitioner's trial counsel that there was an understanding between Rose Jolliff and the State as to the future prosecution of Jolliff's pending cases. See Strickler, 119 S.Ct. at 1948.
The Court also concludes that the State's amended recommendation is a separate and distinct item of Brady material which Goldman had a constitutional duty to disclose. The State made the amended recommendation on or before December 1, 1983  the date Jolliff both testified against Petitioner and pleaded guilty. (Trial Tr., at 673, at 710; Pet.App, at 5, 67; Pet.Ex. 8-H through 8-K; Pet.Ex. 33). The Court heard considerable evidence relating to the issue of whether Steven Goldman, in fact, changed the original recommendation or directed another St. Louis County Prosecutor to change the recommendation.[34]
*975 Because the Court finds that a St. Louis County Prosecutor changed Rose Jolliff's recommendation to six months bench probation, and that the recommendation would not have been changed but for the understanding between Jolliff and the State, the Court need not determine whether Goldman himself changed the recommendation or ordered the recommendation to be changed. The Supreme Court has established that a promise or recommendation made by one prosecutor is attributable to the entire prosecutor's office and the governmental entity prosecuting the case:
A prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for [Brady] purposes to the Government. To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.
Giglio, 405 U.S. at 154, 92 S.Ct. 763 (internal citations omitted). Accordingly, even assuming that Goldman did not make or authorize the unusually favorable recommendation on Jolliff's pending cases, he had an obligation to discover that such a recommendation had been made, that Jolliff pleaded guilty under the terms of the recommendation, and that the recommendation was accepted by the sentencing court, and he had an obligation to disclose this information to Petitioner's trial counsel. See Strickler, 119 S.Ct. at 1948.

4. Failure to Disclose Lyner's Prior Deal with Prosecutors

The evidence establishing that Mary Ellen Lyner had, on a prior occasion, entered into a deal with prosecutors in exchange for favorable treatment on pending cases is Brady material because it impeaches Lyner's trial testimony, and thus tends to establish that Petitioner did not commit the Vicker's murder. See Discussion. Section III.A.3. Steven Goldman admitted that he failed to disclose this evidence to Petitioner's counsel. (Goldman Test.). In fact, Goldman elicited testimony from Lyner at trial, and before the grand jury, indicating that she had never before made a deal with prosecutors in exchange for favorable treatment on pending cases. Because this evidence was favorable to Petitioner and in the possession of the State. Goldman had a constitutional duty to disclose the evidence to Petitioner's counsel. See Strickler, 119 S.Ct. at 1948.

B. The Prejudice Resulting from the State's Failure to Disclose Brady Material

Petitioner is entitled to habeas relief if she can establish that the evidence that the State failed to disclose was "material." See Strickler, 119 S.Ct. at 1948. Evidence is material if its nondisclosure results in sufficient prejudice. Id. (in order for evidence to be material "prejudice must have ensued"). Petitioner, therefore, must establish sufficient prejudice resulting from the State's failure to disclose the Reasonover-White Tape, the Jolliff-Reasonover Tape, evidence of the understanding between Rose Jolliff and the State, and *976 evidence that Mary Ellen Lyner had, on a prior occasion, made a deal with the prosecution in exchange for favorable treatment. Id. Petitioner must establish that there is a "`reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. (citing Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); United States v. Bagley, 473 U.S. at 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Petitioner establishes sufficient prejudice if the "`favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Strickler, 119 S.Ct. at 1952 (quoting Kyles, 514 U.S. at 435, 115 S.Ct. 1555). In determining whether Petitioner has demonstrated sufficient prejudice, the Court must consider the "net effect of the evidence withheld by the State." Kyles, 514 U.S. at 421-22, 115 S.Ct. 1555. The Court will consider the prejudice resulting from the failure to disclose each item of Brady material, and then assess the net effect of the State's failure to disclose such evidence.

1. Prejudice Resulting from Failure to Disclose the Reasonover-White Tape

The evidence before the Court establishes that, had the State disclosed the Reasonover-White Tape, Petitioner would have testified during the guilt-phase of her trial. (Reasonover Test., M. Franklin Test., Pet.App. 1623-26). The evidence is undisputed that Petitioner would have elected to testify, and that her trial attorneys, Forriss Elliott and Madeline Franklin, would have advised her to do so.[35] (Id.). She would have testified as to what she saw and did on the night of the murder, and as to her attempts to help the police identify the assailants. See Discussion, Section III.B.3. She would have also denied making any incriminating statements to Rose Jolliff or Mary Ellen Lyner. Id.
In order to prove its case beyond a reasonable doubt, the State would have been forced to discredit the material points of Petitioner's testimony through cross-examination. Because Petitioner's statements on the Reasonover-White Tape are consistent with the statements to which Petitioner would have testified, any attempt to cross-examine Petitioner would have led unavoidably to the admission of portions of the Reasonover-White Tape as prior consistent statements.
"Missouri courts have held that where a witness is impeached by proof of inconsistent statements, then proof of a statement made by a witness prior to the inconsistent statement, which is consistent with the trial testimony is admissible to rehabilitate the witness." State v. Mueller, 872 S.W.2d 559, 563 (Mo.App.1994) (citing Stafford v. Lyon, 413 S.W.2d 495, 498 (Mo.1967)); Thomas, Rehabilitating the Impeached Witness with Consistent Statements, 32 Mo.L.Rev. 472 (1967). "[T]he law of Missouri does not restrict the use of prior consistent statements to rebut a charge of recent fabrication or improper influence or motive, but permits such statements for whatever rehabilitative value they may have." Mueller, 872 S.W.2d at 563-64 (citing 32 Mo.L.Rev. at 486-87).
Had the prosecution attempted to discredit Petitioner's testimony regarding what she saw and did on the night of the murder, portions of the Reasonover-White Tape would have been admissible to rehabilitate Petitioner. See Mueller, 872 S.W.2d at 563-64. See also, supra, Discussion, Section III.A.1. Had the prosecution questioned Petitioner about her motives in going to the police, portions of the tape would have been admissible to rehabilitate Petitioner. Id. Had the prosecution questioned Petitioner about her statements to Jolliff or Lyner, portions of the tape would have been admissible because 1) the statements made to Jolliff and Lyner are prior inconsistent statements and 2) *977 the statements on the tape are prior consistent statements made by Petitioner prior to her statements to Jolliff and Lyner.[36]Id.
The Court also believes that the trial court may have exercised its discretion and permitted the Reasonover-White Tape to be admitted as extrinsic evidence offered to impeach the testimony of Rose Jolliff. The contents of the Reasonover-White Tape contradict the statements Jolliff attributed to Petitioner in every material respect. See Discussion, Section III. A.2. In addition, the contents of the Reasonover-White Tape impeach Jolliff's trial testimony because Petitioner was speaking to Stanley White  one of the men with whom Jolliff claims Petitioner committed the Vicker's murder  and because the tape was recorded just hours before Petitioner's conversation with Jolliff. (Id.). Under Missouri law, the trial court could have admitted the tape as extrinsic evidence offered to impeach Jolliff's testimony because the tape impeaches Jolliff's testimony on material points, as opposed to "collateral matters." State v. Dunson, 979 S.W.2d 237 (Mo.App.1998) (citing State v. Taylor, 486 S.W.2d 239, 244 (Mo.1972)).
The trial court may also have admitted the Reasonover-White Tape for the purpose of rebutting the State's charge that Petitioner's statements on the Sheila Hill Tape, see Trial Tr., at 442-472, were made in an attempt to deflect attention from Petitioner's own involvement in the Vicker's murder. Petitioner's statements on the Reasonover-White Tape  made while Petitioner believed she was only talking to Stanley White  tend to establish that Petitioner's statements on the Sheila Hill Tape were honest statements regarding what Petitioner saw and did on the night of the murder, rather than statements designed to cover-up Petitioner's own involvement in the murder. Because the State was permitted to use the Sheila Hill Tape to argue inferences adverse to Petitioner, the trial court may have permitted Petitioner to use the Reasonover-White Tape to rebut those inferences.
The Court concludes that the Reasonover White Tape is material evidence because its suppression resulted in significant prejudice to Petitioner. Had the tape been disclosed, the Court concludes that it would have played a significant role at trial. The disclosure of the tape would have resulted in Petitioner testifying at trial and the admission of portions of the tape as prior consistent statements. The contents of the tape would have caused a reasonable juror to view the Sheila Hill Tape as an item of evidence favorable to Petitioner and would have caused a reasonable juror to doubt the testimony of Rose Jolliff and Mary Ellen Lyner.

2. Prejudice Resulting from Failure to Disclose the Jolliff-Reasonover Tape

Had the Jolliff-Reasonover Tape been disclosed, it likely would have been used in the cross-examination of Rose Jolliff. Petitioner's counsel could have confronted Jolliff with her many statements on the tape which tend to impeach her trial testimony. See supra, Discussion, Section III.A.2.a. Petitioner's counsel could have asked Jolliff to admit to facts relating to the Jolliff-Reasonover Tape including the following: 1) Jolliff called Petitioner four days after they were released from the Jennings Jail; 2) she said, "Uh-hm," when Petitioner talked about trying to help the police; 3) she said nothing when Petitioner talked about the police pressuring her to identify suspects; 4) she said, "Uh-hm," when Petitioner talked about seeing the men she saw at the Vicker's station at the 7-Eleven; 5) she said, "Uh-hm," when Petitioner talked about not being able to positively identify the men whom she saw; *978 6) Jolliff said, "Uh-hm," when Petitioner said that she wasn't worried about Marquita Butler because Petitioner told Butler that she "didn't do nothing'"; 7) Jolliff told Petitioner that the police were trying to "stick it" to her; 8) she told Petitioner that she police were trying to "stick it" to her because they "figured" Petitioner said "something to someone in the cell"; 9) Jolliff did not say why the police "figured" this; 10) she did not say what the police "figured" Petitioner said; 11) she did not say to whom the police "figured" Petitioner spoke; 12) Jolliff stated that the police threatened to arrest her for withholding evidence; 13) Petitioner did not mention anyone by the name of Robert McIntosh; 14) Petitioner did not mention any nickname likely to be associated with the name of Robert McIntosh; 15) Petitioner did not mention any details suggesting that she knew the specific manner in which James Buckley died; 16) Petitioner did not mention that Buckley was shot seven times; 17) Petitioners did not mention that a rifle was used; 18) Petitioner did not mention who shot the gun; 19) Petitioner did not mention any details suggesting that she knew what the intentions of the assailants were; 20) Petitioner did not mention knowing that someone was supposed to distract the attendant at the window; 21) Petitioner did not mention that the attendant was shot because he could identify the assailants. Id.
Each of these facts is favorable to Petitioner, and tends to prove that Petitioner did not confess to Rose Jolliff on January 7, 1983. Any attempt Rose Jolliff might have made to deny these facts would have resulted in Jolliff's impeachment with the words spoken on the Jolliff-Reasonover Tape.
The Jolliff-Reasonover Tape may also have been admitted as extrinsic evidence offered to impeach Rose Jolliff's testimony. Under Missouri law, the trial court could have admitted the tape as extrinsic evidence offered to impeach Jolliff's testimony because the tape impeaches Jolliff's testimony on material points, as opposed to "collateral matters." State v. Dunson, 979 S.W.2d 237 (Mo.App.1998) (citing State v. Taylor, 486 S.W.2d 239, 244 (Mo.1972)). Because Jolliff makes statements on the tape that are inconsistent with her trial testimony, she would have been entitled to admit, deny, or explain the statements so that she had an opportunity to "present a complete picture of ... her credibility by explaining any inconsistency." State v. Boyd, 871 S.W.2d 23, 26 (Mo.App.1993) (citing State v. Ivicsics, 604 S.W.2d 773, 780 (Mo.App.1980)).
Portions of the Jolliff-Reasonover Tape would have also been admissible as prior consistent statements offered to rehabilitate Petitioner's testimony. For example, had the prosecution questioned Petitioner about what she saw and did on the night of the murder, or her motives in going to the police, portions of the Jolliff-Reasonover-Tape would have been admissible as prior consistent statements. See Mueller, 872 S.W.2d at 563-64 (citing Lyon, 413 S.W.2d at 498; 32 Mo.L.Rev. at 486-87). See also, supra, Discussion, Section III.A.2.a.
The Court concludes that the Jolliff-Reasonover Tape is material evidence because its suppression resulted in significant prejudice to Petitioner. Had the tape been disclosed, the Court concludes that it would have played a prominent role at trial. The contents of the tape would have had a devastating impact on Jolliff's credibility at trial. Whether admitted in the course of Jolliff's cross-examination, or as extrinsic evidence during the defense case, the contents of the tape would have caused any reasonable juror to have grave doubts about Jolliff's trial testimony. Furthermore, portions of the Jolliff-Reasonover Tape could have been utilized to rehabilitate attacks on Petitioner's credibility, as Petitioner's statements on the tape are consistent with the facts to which Petitioner would have testified. Petitioner's statement on the Jolliff-Reasonover Tape would have also caused a reasonable juror to doubt whether Petitioner confessed to Mary Ellen Lyner.

*979 3. Prejudice Resulting from Failure to Disclose the Existence of the Understanding Between Jolliff and the State

The State cast Rose Jolliff as a witness who was "completely different" than Mary Ellen Lyner because Jolliff did not have a "reason in the world to by lying." (Trial Tr., at 840). Because Jolliff testified that she did not receive "any kind of recommendation on [her pending cases] at all" in exchange for her testimony, Id., at 701, Steven Goldman was able to argue to the jury that Jolliff was a witness with "absolutely no reason to make any of this stuff up." Id., at 840, whose coming forward as a witness was a singular act of courage. (Trial Tr., at 884) (encouraging the jurors to have the "courage that Rose Jolliff did to come forward and show Ellen Reasonover she can't cover up these robberies with murder").
Had the State disclosed the evidence that it had entered an understanding with Jolliff in which she would receive favorable treatment on her pending cases in exchange for her testimony. Petitioner's counsel would have cross-examined Jolliff as to this "understanding." The jurors would have discovered that Jolliff did, in fact, have a reason to lie. See supra, Discussion, Section III.A.2.b. Indeed, a reasonable juror may have concluded that Jolliff had more of a reason to lie than did Lyner because the details of Jolliff's plea agreement were not going to be worked out until after Jolliff's testimony. Id. Cf., United States v. Bagley, 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (the fact that the possibility of receiving reward money was not "guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely").
Had the State complied with its obligations under Brady v. Maryland, the jury would also have discovered that after Jolliff's testimony she pleaded guilty to her pending charges pursuant to an amended recommendation which was unusually favorable to Jolliff, and significantly more favorable than the State's original recommendation. See supra, Discussion, Section III.A.2.b. The State made the amended recommendation on or before December 1, 1983  the date Jolliff both testified against Petitioner and pleaded guilty. (Trial Tr., at 673, at 710; Pet.App. at 5, 67; Pet.Ex. 8-H through 8-K; Pet.Ex. 33). The guilt-phase of Petitioner's trial was not completed until December 2, 1983. (Pet.App. at 5, 66). Had the State disclosed the existence of the amended recommendation, and the fact that Jolliff plead guilty pursuant to the recommendation was accepted by the Court, Jolliff could have been called as a witness in the defense case on December 1 or 2, 1983. Petitioner's counsel could have confronted Jolliff with the extremely favorable details of the State's amended recommendation considered in light of Jolliff's previous testimony that the State did not make "any kind of recommendation on [her pending cases] at all" in exchange for her testimony against Petitioner. Id., at 701.
For these reasons, the Court concludes that the evidence of an understanding between Jolliff and the State which resulted in the extremely favorable disposition of Jolliff's pending cases was material evidence, as its suppression resulted in significant prejudice to Petitioner.

4. Prejudice Resulting from Failure to Disclose Lyner's Prior Deal with Prosecutors

Had the State disclosed evidence that Mary Ellen Lyner made a deal with the prosecution in exchange for the dismissal of her cases in cause number 406883, the jury would have discovered that Lyner misrepresented herself in her testimony before the grand jury when she testified as follows:
Q: [H]ave you ever in the past testified against anyone?
A: No, I haven't

*980 Q: Alright. Or made any kind of an arrangement like this in the past.
A: Never.
(Resp. Hr'g Ex. B, at 22). This evidence could have been used by Petitioner's counsel to discredit Lyner on cross-examination. In addition to learning that Lyner was less than forthcoming in her testimony before the grand jury, the jury would have learned that Lyner was a repeat deal maker who had previously received favorable treatment in exchange for cooperating with the State. For these reasons, the Court concludes that this evidence was material, as its suppression resulted in significant prejudice to Petitioner.

5. The Net Effect of the Failure to Disclose Evidence Favorable to Petitioner

The net effect of the State's failure to disclose the Reasonover-White Tape, the Jolliff-Reasonover Tape, evidence of the understanding between Rose Jolliff and the State, and evidence that Mary Ellen Lyner had, on a prior occasion, made a deal with the prosecution in exchange for favorable treatment undermines the Court's confidence in the outcome of Petitioner's trial. The State's failure to disclose this evidence not only deprived Petitioner's trial counsel of the opportunity to use these items of evidence at trial, see supra, Discussion, Section IV. B.1-4, but also deprived Petitioner's trial counsel of the opportunity to assess accurately the value of other evidence that may have been available at the time of trial, such as the testimony of Petitioner, Marquita (Butler) Hinton, Officer Marsha Vogt, Stanley White, Dale Weston, Woodrow Weston, Carol (Coates) Tucker, Rose Winston Todd. Arthur Greenwood, and Virginia Druhe. See supra, at Discussion, Section III.B.1-6. The failure to disclose the "Brady material" also deprived Petitioner's trial counsel of the opportunity to evaluate fully what facts needed to be discovered prior to trial.
The Court concludes that there is, at least, a "`reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Strickler, 119 S.Ct. at 1952 (citing Kyles, 514 U.S. at 433-34, 115 S.Ct. 1555; Bagley, 473 U.S. at 682, 105 S.Ct. 3375). While no certainty exists as to how the Missouri trial court would have treated each item of evidence that the State failed to disclose, the cumulative effect of this evidence can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 119 S.Ct. at 1952 (quoting Kyles, 514 U.S. at 435, 115 S.Ct. 1555).
Had the State disclosed the items of evidence favorable to Petitioner, taking into account the probable evidentiary rulings of the Missouri trial court, the jury would have been entitled to find: (1) that Petitioner was a credible witness whose testimony was corroborated by the Reasonover-White Tape and the Jolliff-Reasonover Tape; (2) that Rose Jolliff's testimony was not credible in light of Petitioner and Jolliff's statements on the Jolliff-Reasonover Tape; (3) that Rose Jolliff's testimony was not credible in light of the Reasonover-White Tape, recorded just hours before Petitioner was incarcerated with Rose Jolliff; (4) that Rose Jolliff's testimony was not credible in light of Petitioner's trial testimony[37] as corroborated by the Reasonover-White Tape and the Jolliff-Reasonover Tape; (5) that Rose Jolliff's testimony was not credible in light of the understanding that existed between Jolliff and the State; (6) that Mary Ellen Lyner's testimony was not credible in light of Petitioner's trial testimony as corroborated by the Reasonover-White Tape and the Jolliff-Reasonover Tape; (7) that Mary Ellen Lyner's testimony was not credible in light of the evidence that she entered into a prior deal with prosecutors and *981 denied entering such a deal when questioned by the grand jury; (8) that Petitioner's statements on the Sheila Hill Tape were honest statements regarding what Petitioner saw and did on the night of the murder, rather than statements designed to cover-up Petitioner's own involvement in the murder, when considered in light of Petitioner's trial testimony as corroborated by the Reasonover-White Tape and the Jolliff-Reasonover Tape.
"Since all of these possible findings were precluded by the prosecution's failure to disclose the evidence that would have supported them. `fairness' cannot be stretched to the point of calling this a fair trial." Kyles, 514 U.S. at 453-54, 115 S.Ct. 1555. The prosecution's failure to turn over evidence favorable to the defense rendered Petitioner's trial fundamentally unfair and deprived Petitioner of her rights under the Due Process Clause. Because Petitioner was denied the process she was due under the United States Constitution, the Court will grant Petitioner's First Amended Petition for Writ of Habeas Corpus. The Court need not adjudicate Petitioner's other constitutional claims, for the Brady claims addressed by the Court are sufficient to warrant habeas relief.
The Court will vacate the Judgment and Sentence in State of Missouri v. Ellen Maria Reasonover, Cause No. 488120. (Pet.App.46). The Court will enter a Writ of Habeas Corpus ordering Respondent to release Petitioner from all custody resulting from this Judgment and Sentence within thirty (30) days.
ACCORDINGLY,
IT IS HEREBY ORDERED that Petitioner's First Amended Petition for Writ of Habeas Corpus (Docket # 13) is GRANTED.
IT IS FURTHER ORDERED that the Judgment and Sentence in State of Missouri v. Ellen Maria Reasonover, Cause No. 488120, is VACATED.

APPENDIX, EXHIBIT A
JOLLIFF-REASONOVER TAPE: Transcript Created by The Court
REASONOVER: ________ scared of him _________ get drunk ___________ tryin' to fight me and shit. Cause I ain't [lived with Stan or been with this man] for about 3 or 4 months. Cause, uh, you know he was really bad, but then I told him if he ever got drunk again, god truth, then I would ___________ so that's what happened, so ___________ he got drunk ___________ I called the police officer, then he called me back and told me ___________ he ___________ wanted to come clean the glass up. Then I told him, well (cough), don't come (coughs).
JOLLIFF: Ya know what they told me? (Clicks)
REASONOVER: Hold on.
JOLLIFF: Ok.
REASONOVER: So ya know I kept tellin' him don't come, ___________ he come anyway, so I just let him come on. I had called the police ___________ supposed to be on the way ___________ got here ___________ [lock or locked] him up. And, uh, that was supposed to be when they all ___________. When they had me up there for that Vicker's thing, they had asked me when I ___________ another incident last ___________. So ya know I told you I had that other Vicker's thing back in '78 when I used to work there.
JOLLIFF: Uh-huh.
REASONOVER: And they tried to put me in the penitentiary for 30 years.
JOLLIFF: Yeah.
REASONOVER: They tripped off ___________ I had the other Vicker's thing ___________ they mighta thought ___________. And ___________.
JOLLIFF: Well, you know, you know, they ___________ what they, the way they tried to run it to me was, uh, you know, you going to be locked up if you're trying to hold evidence back *982 ____________ you know as far as what things she told you, uh, you gonna to be in jail too. And I said, `I don't lie, I'm gonna be in jail, be in jail for what? I ain't you know ____________.' And they said, `Well I know she told you, you know, what went on.' And I said, `Well how you know what, if you know that she told me something, why are you asking?' So they did nave a tape up on the well, and you know that thing that was up on that wall.
REASONOVER: Um-hm.
JOLLIFF: So, uh, uh, ya know, they, and then they went on, that you supposed to have went into the police station or somethin' and identified somebody and ____________.
REASONOVER: Uh-huh.
JOLLIFF: ____________ some shit, yeah.
REASONOVER: They had me identifying girl ____________ I was picking out every motherfucker that I seen in that book (laugh).
JOLLIFF: (laugh)
REASONOVER: I was pickin' out one or two niggers that was locked up already, they was locked up.
JOLLIFF: Um-hm.
REASONOVER: I was pickin' out every motherfucker that I thought it coulda been, ya know, but see I was really trying to help they motherfuckin' ass.
JOLLIFF: Um-hm.
REASONOVER: Ya know what I'm saying? And they was pressuring me and shit. But ya know I .
JOLLIFF: Well, you know you ain't got, I, I, I, was just lettin' you know that, ya know, you don't have to trip off of me ____________ but if they ____________ I don't know if they picked that other girl up or not, they might have. You might trip off of her.
REASONOVER: Well, if they do pick her up, then, uh, they ask her anything all she's gonna tell them is what I told her. That I ain't did shit. Because I didn't do nothin'.
JOLLIFF: Um-hm.
REASONOVER: But ya know seriously girl, these motherfuckers are trying to give me a motherfuckin' case just because .
JOLLIFF: But ya know, ya know, at one time, you did, ya know, you did say something about it.
REASONOVER: Yeah, I said. I probably said something about it, but, uh, I know ____________ knowing that I am, ya know, innocent and shit ____________ I know ____________ I did not at no time ____________ did I say somethin' that like that I had did ____________ or somethin'. I probably did that to give me a case with some bullshit that I do and I mighta been tellin' y'all, ya know, what happened and shit.
JOLLIFF: Yeah.
REASONOVER: Ya know, but, uh, them motherfuckers are crazy girl, tryin' to give me a motherfuckin' case for ____________ I didn't do. When I had got up to the motherfuckin' 7-Eleven, the niggers I had seen coming in looked like the nigger I had seen coming out that was goin' in the back when I was pulling up there.
JOLLIFF: Um-hm.
REASONOVER: And, uh, what I was saying, it might not even coulda been them. It could have been some more niggers.
JOLLIFF: Um-hm.
REASONOVER: You know what I'm saying? That one just looks like it to me, ya know what I'm saying?
JOLLIFF: Yeah.
REASONOVER: But, uh I ain't even do ____________.
JOLLIFF: ____________ Well, ya know, just be cool ____________ whatever ____________ watch what you're saying to whoever you're saying it too `cause 
REASONOVER: Um-hm.
JOLLIFF: They makin', ya know, they tryin' to stick it to ya, so 
*983 REASONOVER: ____________ my girl-friend called me up today and told ___________ Valerie Clark ____________ wanted me ____________ pointed out. And, uh, they really thought I was lyin' on that, which I wasn't, I just told them then, shit, and uh, they came and picked her up yesterday and took her down there and ____________ her, did I tell her that I had did this and shit.
JOLLIFF: Um-hm.
REASONOVER: Tryin' to get her to say, `Yeah, she told me she did it,' and I was like, `I did.'
JOLLIFF: Well, you know, you know, you ain't gonna get Stan ____________ stupid.
REASONOVER: Well yeah, I ain't that crazy.
JOLLIFF: Yeah, they, they, I, I don't know what they be thinkin' about like ya know you gonna tell them ____________ that ____________ you ____________ did something ____________ and, and, them listening on the damn wall they think you can't, people ain't got enough sense to notice and to be quiet. See I don't know what people, ya know I just don't know what they be thinkin'. But, uh, ya know I just thought I would let you know what was happen' ____________. I knew you had said somethin' about you stayed on Chambers. So I called the directory and they had ____________ Elizabeth, ya know and I didn't know whether that was you or not.
REASONOVER: Um-hm. Yeah, that's my mom. You got my last name though?
JOLLIFF: Uh-hum. You had told me everything.
REASONOVER: Right.
JOLLIFF: So, ya know, I knew how to go, ya know, I been in the street long enough to know how to go about. I don't know what that other broad is doing, but, ya know, be aware what's happenin'. Ya know, keep a low profile.
REASONOVER: ____________. When did you get out?
JOLLIFF: Oh, I just got out the day before yesterday.
REASONOVER: You were?
JOLLIFF: Um-hm. ____________. They didn't want to let me out.
REASONOVER: How long were you in there?
JOLLIFF: ____________. From, um, Tuesday, last Tuesday.
REASONOVER: Till what?
JOLLIFF: The day before yesterday.
REASONOVER: That's how many days, about five days?
JOLLIFF: (Jolliff can be faintly heard counting days). Yeah.
REASONOVER: Five days?
JOLLIFF: Six days ____________. They had made my bond and everything. They just, they held me an extra 20 hours, even after they made my bond.
REASONOVER: They had you more than 20 hours ____________ made your bond.
JOLLIFF: After I made my bond, they held me another 20 hours, that was just out of ____________
REASONOVER: Yeah, because ____________ they did me like that too. `Cause, uh ____________ they locked me up and had me for more than 20 hours.
JOLLIFF: Did they?
REASONOVER: Hell yeah ____________ day and a half ____________ I had counted up to 30 hours.
JOLLIFF: Hmm. Well, uh, uh, uh, if you know your phone tapped, be cool.
REASONOVER: ____________ Yeah, but what I can't understand is ____________ why are they tryin' to stick me with something I didn't do?
JOLLIFF: I guess they figured you said something to someone in the cell.
REASONOVER: But you know what? They were taping me ____________ wadn't doin' nothin'. I think they was taping me when we was out at Dellwood ____________.
JOLLIFF: Well, they probably figured that you wadn't gonna say nothin' once, *984 once, they, they said that they figured you wouldn't say nothin' in the cell, when you was in the cell with us, no way, because, uh, they said somethin' about tapin somethin' in Dellwood.
REASONOVER: They did?
JOLLIFF: Uh huh. So you had told me that already, you know.
REASONOVER: Hell, yeah, they was, uh, taping _____________ in Dellwood, and shit.
JOLLIFF: So, you know, you knew not to say nothin' no ways, shit.
REASONOVER: But I didn't know they were taping me though.
JOLLIFF: I didn't either, until they, they said somethin' about, somethin' about Dellwood or somethin' and I knew you had said somethin' about the tape or somethin' in Dellwood. I didn't know they was taping the conversation in the jail cell either.
REASONOVER: They had an intercom ____________ intercom ____________.
JOLLIFF: Aw, is that what that was?
REASONOVER: Yeah, they had ____________ intercoms ____________.
JOLLIFF: Uh-huh, but they must think people are crazy, they must think you ____________ I don't know how they thought you was goin' to just continuous to talk about it, god damn, to them up through the intercom.
REASONOVER: ____________ I ain't did it ____________ 4 days ____________.
JOLLIFF: Did they?
REASONOVER: Hell yeah ____________.
JOLLIFF: I know you said, I know you said you was goin' home that day ___________.
REASONOVER: ____________
JOLLIFF: They ain't got no evidence, they ain't go no evidence that you did, that you ____________.
REASONOVER: I know, but you know what, uh, they could get some motherfuckin' evidence ____________ but it ain't going to point, point, to this motherfuckin' way, you know what I'm sayin. `Cause I ain't did shit. Ya know? And uh, I talked to my lawyer and my lawyer said they told him when they first locked me up. I wasn't under arrest.
JOLLIFF: That you weren't under arrest?
REASONOVER: Right when they first came and got me to my house they just had me for questioning. That's why I did more than 20 hours.
JOLLIFF: Oh.
REASONOVER: You know what I'm sayin'. I wasn't under arrest until they booked me ____________ booked me. That's another way they get you in shit.
JOLLIFF: ____________. If you need to get in touch with me ____________.
REASONOVER: ____________ get your phone ____________ (pause) ____________ apartments ____________ Lucas & Hunt ____________ apartments.
JOLLIFF: Yeah, ____________ Well, I'm down on ____________.
REASONOVER: Oh, toward St. Luke's.
JOLLIFF: Yeah, I'm down on Evans ____________ I'm stayin' clear from him `cause ____________.
REASONOVER: ____________ sitting across the street waiting ____________.
JOLLIFF: ____________
REASONOVER: Girl, yeah.
JOLLIFF: Okay, gotta pencil?
REASONOVER: Uh-huh.
JOLLIFF: 621-2476.
REASONOVER: (Reasonover can faintly be heard repeating number then calls Jolliff a name which sounds like Carlin, Carly or Carol). Okay then.
JOLLIFF: Okay, take care.
REASONOVER: Thanks for calling. I'm gonna call, you hear?
JOLLIFF: Alright.

*985 APPENDIX, EXHIBIT B
JOLLIFF-REASONOVER TAPE: Transcript Submitted to the Court as Ex. A to Petitioner's Post-Hearing Brief.
REASONOVER Cause I ain't even lived with Stan for 3-4 months, cause _________ gettin drunk again _________ that's what happened _________ I called the police on him, then he comes back ___________ and I told ___________ don't come (coughs)
JOLLIFF Ya know what they told me? (Clicks)
REASONOVER Hold on.
JOLLIFF Ok. (pause)
REASONOVER So ya know I'm telling him don't come, and he come anyway, well I just let him come on. I had called the Police and have them lock him up and uh lock him up. So when they ask me about the Vickers thing, they ask _________ when I had that other incident last _________ I told you I had that other Vicker's thing back in '78 when I used to work there they tried to put me in the penitentiary for 30 years, they tripped off ___________.
JOLLIFF The way they tried to run it to me was, uh, you going to be locked up, you're trying to hold evidence back as far as what things she told you, you going to be in jail too. I told I ain't gonna be in jail ten years, for what? I ain't ya know, and said, well I know she told you, you know what went on, and I said well how you know what she said, if you know she told me something, why you askin'? You know, so they did have a tape up on the wall, and you know that thing that was up on that wall.
REASONOVER Uh-hmn.
JOLLIFF So uh uh they, then they come, did you suppose to have went in the Police station to come identify somebody and some shit?
REASONOVER They had me identifying, girl, I was picking out every motherfucker that I seen in that book (laughs) I was pickin' one or two niggers that was locked up already, they was locked up.
JOLLIFF Uhm-hmmn
REASONOVER I was picking every motherfucker I thought it could have been, ya know, cause I was really trying to help that motherfucker man, ya know what I'm saying? And they was pressuring me, ya know.
JOLLIFF You know you ain't got, I was just lettin' ya know that you know, you don't have trip off'n me, but I don't know if they picked that other girl up or not they might have, you might trip off on her.
REASONOVER Well if they do pick her up and uh ask they her anything, I'm just gonna tell em what I told her, I said I ain't did shit, cause I didn't do nothin'!
JOLLIFF Uhm-hmmn
REASONOVER But ya know, seriously, the other motherfucker trying give me a motherfuckin' case just because 
JOLLIFF But ya know, at one time, you know, remember, you did say something about it.
REASONOVER Yeah, I said. I probably somethin' about it, but uh, I know, knowing that I uh, I'm innocent and shit, I know ___________ like I'd say somethin' like that I had did and somethin. I probably did that to deal their case with some bullshit that I do and I been might tellin y'all, you know, what happened and shit. Ya know, but uh, them motherfucker's crazy girl, trying to give me motherfucking case what I didn't do. So I got up to ____________ on something else ___________ the niggers I had seen coming in, just like the niggers I had seen going in the back when I was pulling up there, but uh, what I'm saying, it might not coulda even have been them, coulda been some more niggers. You see what I'm saying? That one just looks like it to me, see what I'm saying?
JOLLIFF Yeah
REASONOVER But, uh, I ain't even ___________ like that.
*986 JOLLIFF _____________ just keep cool and whatever _____________ they trying to stick it to ya.
REASONOVER _____________ my girl-friend called me yesterday and told me the guy _____________ wanted me _____________ one I pointed out. And they told me I got off lyin' on them, which I wasn't, I didn't know that man, shit. And they came and picked her up yesterday and took her down there _____________ and telling her that I had did it and shit. Trying to get her to say yeah, she told me she said she did it.
JOLLIFF Well you know, you know you ain't going to get Stan _____________ fucking no way, that would be stupid.
REASONOVER Hell, yeah!! I ain't that crazy.
JOLLIFF Yeah, I don't know what they be thinking `bout like you going to tell the motherfuckers that you done did something and them listening on the damn wall. They think that people don't have enough sense to notice and be quiet talking? People, I just don't know what they be thinking but just thought I'd let you know what was happening and you know I knew you had said something about you stayed on Chambers. I called directory and they had Elizabeth and I didn't whether that was you or not 
REASONOVER Huh um, yeah, that's my Mom, she got my last name though.
JOLLIFF Yeah, you told me everything.
REASONOVER Right.
JOLLIFF You know. I knew how to go, ya know, I been on the streets long enough to know how to go about. I don't know what that other crowd is doing. But, ya know, be aware what's happening. Ya know, keep a low profile.
REASONOVER Right. When did you get out?
JOLLIFF Oh, I just got out the day before yesterday.
REASONOVER You were?
JOLLIFF Uh um  8-10, they didn't wanna let me out.
REASONOVER How long was you in there?
JOLLIFF Uh-Tuesday, last Tuesday.
REASONOVER Till what?
JOLLIFF Till the day before yesterday.
REASONOVER That's how many days, about five days?
JOLLIFF Tuesday, Wednesday, Thursday, Friday, Saturday, Sunday. Yeah.
REASONOVER Five days?
JOLLIFF Six days they had made my bond and everything. They held me an extra 20 hour even after they made my bond.
REASONOVER They held you for 20 hours after you made bond.
JOLLIFF After I made my bond they held me another 20 hours. That was just out of _____________.
REASONOVER Yeah, cause they did me like that too. They locked me up and uh, had me for more than 20 hours.
JOLLIFF Did they?
REASONOVER Hell yeah, a day and a half. _____________ I had counted up to 30 hours.
JOLLIFF If you know your phone's tapped, be cool.
REASONOVER I'm hip, but why can't they understand it, girl, why they trying stick me with something I didn't do.
JOLLIFF I guess the things you said _____________ in the cell.
REASONOVER But you know what, they was taping me, _____________ so mother-fucking made for not doing nothing. I think they was taping me back at Dellwood.
JOLLIFF They probably think you wan't gonna say nothing, they figured you wasn't going to say nothing in the cell when you with us, no way, cause they said something about taping some in Dellwood.
REASONOVER They did?
JOLLIFF Uh huh, so you had told me that already, you know.
*987 REASONOVER Hell yeah, ____________ taping in ____________ Dellwood.
JOLLIFF So you better not say nothing no ways.
REASONOVER But I didn't know they's taping me though.
JOLLIFF I didn't either, till they said something about, something about Dellwood something and I knew you had said something about the tape or something in Dellwood. I didn't know they was taping conversation in the jail cell either.
REASONOVER They had an intercom ____________
JOLLIFF Aw, is that what that was?
REASONOVER Yeah, they had intercoms _____________
JOLLIFF Uh huh, but they must thing people crazy ____________, they must thing you continuously talk about it to them by the intercom.
REASONOVER ____________ I ain't did it. ____________ 4 days.
JOLLIFF Did they?
REASONOVER Hell, yeah, cause ____________.
JOLLIFF I know you said, I know you said you was going home that day ____________.
REASONOVER ____________
JOLLIFF They ain't got no evidence, they ain't got no evidence that you did, that you can ____________.
REASONOVER I know, but you know what, they could get some motherfucking evidence but it ain't going to point to this motherfucking way, cause I ain't did shit! Ya know? And uh, I talked to my lawyer and my lawyer said they told him when they first locked me up. I wasn't under arrest.
JOLLIFF That you weren't under arrest?
REASONOVER Right when they first came got me to my house just had me for questioning. That's why they held me more than 20 hours.
JOLLIFF Ummmm.
REASONOVER And then I wasn't under arrest till they booked me, ____________ and that's another way they get you in shit.
JOLLIFF Well, please get in touch with me.
REASONOVER ____________ I'll come through there and holler at you. Hold on, Yeah, well, you stay over at those apartments ____________ Lucas and Hunt Apartments?
JOLLIFF Yeah, I'm down on ____________ down on Evans (?) ____________. I'm staying clear from him cause ____________.
REASONOVER ____________ sitting across the street ____________.
JOLLIFF Ok. You got a pencil? 621-2476.
REASONOVER 621-2476. Ok then. Thanks for calling.
JOLLIFF Ok, take care.
REASONOVER I'll call you, hear?
JOLLIFF Ok, bye.
REASONOVER All right, bye.
NOTES
[1] Petitioner filed a five volume appendix with her First Amended Petition for Writ of Habeas Corpus. The Court will cite this appendix as "Pet.App."
[2] Prior to being arrested, Petitioner failed a "stress test" designed to test whether she was telling the truth about the Vickers incident. (Suppression Hr'g Tr., at 60-64). This evidence was not presented at trial as it was inadmissible under Missouri law. See State v. Biddle, 599 S.W.2d 182 (Mo.1980) (en banc).
[3] Jolliff testified that Petitioner said that "Robert McIntosh was a former boyfriend" and "Stanley White was her boyfriend." (Id., at 678). She further testified that Petitioner worked at a "massage parlor" and McIntosh was a "pimp in the city." (Id., at 677, 682).
[4] The Supreme Court explained that it must presume that a reasonable juror would "conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." Schlup, 513 U.S. at 329, 115 S.Ct. 851.
[5] The Schlup case was remanded to the Court of Appeals and then to the District Court from the United States Supreme Court. Schlup, 513 U.S. at 332, 115 S.Ct. 851. In accordance with the Supreme Court's opinion in Schlup, the District Court considered the "new statements" of Faherty and Green in assessing Schlup's showing of actual innocence. Schlup v. Delo, 912 F.Supp. 448, 453-455 (E.D.Mo. 1995).

The Court notes that the Supreme Court also indicated that the "sworn statements of several eyewitnesses" were "new statements" that were "particularly relevant" in assessing Schlup's showing of actual innocence. Schlup, 513 U.S. at 316-317, 331, 115 S.Ct. 851. The Supreme Court did not mention whether these statements were available at the time of trial. On remand, the District Court considered the eyewitness testimony in assessing Schlup's showing of actual innocence. Schlup, 912 F.Supp. at 450-53.
[6] The petitioner bears the burden of proof because, "[h]aving been convicted by a jury," the petitioner "comes before the habeas court with a strong  and in the vast majority of the cases conclusive  presumption of guilt." Schlup, 513 U.S. at 325 n. 42, 115 S.Ct. 851.
[7] Not only is it difficult for the petitioner to prevail under the Schlup standard, but in the vast majority of habeas proceedings the petitioner does not even allege that he is innocent. See Schlup, 513 U.S. at 321-22, 115 S.Ct. 851 ("Judge Friendly's observation a quarter of a century ago that `the one thing almost never suggested on collateral attack is that the prisoner was innocent of the crime' remains largely true today.") (citing Friendly, supra, at 145).
[8] The following hypothetical illustrates the Court's point: A habeas petitioner presents a claim of ineffective assistance of counsel which is procedurally barred. The petitioner is unable to establish cause and prejudice. The petitioner presents compelling evidence of actual innocence, but all the evidence was available at the time of trial and could have been discovered in the exercise of due diligence. Further, petitioner presents evidence that the available evidence was not utilized because of trial counsel's lack of diligence.

Under the Eighth Circuit's definition of new evidence, the petitioner's Schlup claim must fail, notwithstanding the compelling evidence of actual innocence. Under Amrine, the evidence presented by the petitioner is not "new," and therefore may not be considered by the habeas court. Amrine, 128 F.3d at 1230. The petitioner's claim would be procedurally barred, and the habeas court would be precluded from ruling on the petitioner's ineffective assistance of counsel claim.
In contrast, under Schlup, the evidence presented by the petitioner is "new" because it was "not presented at trial." Schlup, 513 U.S. at 324, 115 S.Ct. 851. Assuming that the new evidence is reliable and sufficient to sustain the petitioner's burden under Schlup, the habeas court must consider the merits of the petitioner's ineffective assistance of counsel claim because failure to do so would result in a "fundamental miscarriage of justice." Id., at 320-21.
[9] In the Jolliff-Reasonover Tape, see infra, Discussion, Section III.A.2.a, Jolliff and Petitioner discuss whether Petitioner knew that the police were taping her conversation at the Dellwood jail. (Appendix, Ex. A, at 983-84). Jolliff, believing that Petitioner knew the police were taping her, says, "So, you know, you knew not to say nothin' no ways, shit." (Id., at 983). Petitioner responds, "But I didn't know they were taping me though." (Id., at 984).
[10] The trial record indicates that White knocked out Petitioner's car windows on or before December 28, 1982. (Trial Tr., at 485-86).
[11] In the transcript of the Reasonover-White Tape, "R" stands for Ellen Reasonover and "W" stands for Stanley White. (Pet.Ex.3).
[12] See also, Id., at 25 (Petitioner says, "[T]he P.A. say, `if ... you snitch on Stan they'll let you scott clean free.' I tell him, "Fuck, I ain't gonna snitch on him! Fuck, I don't know shit about no motherfuckin' Vicker's and Stan! ... I say, `You want me to lie on that man for nothin'? He ain't did shit.' He talkin' bout, `Yeah, I tell you what, then, that's alright,'" he said, `that nigger spill the beans on you, we're gonna let his motherfuckin' ass go'  which I knew that was a lie  `and gonna lock you motherfuckin' ass up.'").
[13] The "little" boy to which Petitioner is referring was, in fact, six foot eight inches tall and approximately two hundred pounds. (Trial Tr., at 343). In the course of their conversation. Petitioner and White make no reference to James Buckley's unusually large size.
[14] Believing that they are being harassed by the police. Petitioner and White discuss whether they might be able to sue the police officers when they get out of jail. (Id., at 24-25).
[15] The Court notes that Petitioner statements on the Reasonover-White Tape are also consistent in all relevant respects to Petitioner' Statements to Officer Ron Pike on January 3, 1983, (Trial Tr., at 560-63), and Petitioner' statements to Officer Marsha Vogt on February 25, 1983. (Suppression Hr'g Tr., at 92-99). See infra, Discussion, Section III.B.4.
[16] The conversation begins at the eight-minute forty-one second mark ("8.41") of Side A and ends at 18.52 on the same side. (Pet. Ex.37).
[17] On July 29, 1999, Petitioner submitted an enhanced copy of the Jolliff-Reasonover Tape as Petitioner's Exhibit 37A. The parties stipulated that this exhibit may be considered as part of the record.
[18] It is not clear whether Jolliff called Petitioner at the request of the police, or whether Jolliff even knew that the conversation was being recorded. It is clear, however, that Petitioner was unaware that the conversation was being recorded.
[19] The Court has identified those portions of the tape that are impossible to understand by inserting a blank underline, i.e. "___________." See Appendix A. Ex. A.
[20] When referring to the transcript of the Jolliff-Reasonover Tape, the Court will refer to Rose Jolliff as "J" and Ellen Reasonover as "R".
[21] Jolliff indicates that she told the police, at least initially, that Petitioner had not told her anything incriminating about the Vicker's murder. (Appendix, Ex. A, at 981-82). According to Jolliff, the police accused Jolliff of trying to "hold evidence back" and told her that she was "gonna be in jail too." (Id.). Jolliff says that she told the police, "`I don't lie, I'm gonna be in jail, be in jail for what? I ain't you know ______.'" (Id.).
[22] The summary says "Carol Weissnor, Defense Attorney" rather than Ellen Reasonover's Defense Attorney, but White testified that she assumes that this was the result of an error by her secretary. (White Test.).
[23] The Court does not believe that Jolliff's relocation to Indiana is a plausible explanation for the unusually favorable disposition of her pending cases. The Court credits the testimony of Lawrence Mooney who testified that transferring probation to other states was "routine" in felony cases. (Mooney Test.).
[24] To the extent that recanted testimony is "new evidence" under the Eighth Circuit's formulation, a witness' invocation of the Fifth Amendment subsequent to trial is also "new evidence." See Amrine, 128 F.3d at 1228-29 (indicating that recanted testimony is "new evidence").
[25] Mary Ellen Lyner did not testify at the evidentiary hearing. She committed suicide in 1990 or 1991. (Druhe Test.).
[26] Lyner's credibility was further impeached by her testimony that, after informing the police about Petitioner's statements, she was transferred from the St. Louis County Jail  where she had been for almost three months  to a "work release dorm." (Id., at 617). Lyner also admitted that, on February 9, 1983, she was "looking for a way not to go to the penitentiary," and that she was "looking for a deal." (Id., at 620).
[27] The Court notes that, two years later, the Missouri Supreme Court held that a nolle prosequi order could not be entered after verdict without leave of the trial court. Norwood, 691 S.W.2d at 240-41.
[28] The warrant information sheet indicates that Lyner was arrested while selling the stolen property at a pawn shop, that she confessed, that she told the police where the rest of the property could be recovered, and that the rest of the property was recovered in the place specified by Lyner. (Pet.Ex.34).
[29] The Court notes that Petitioner statements on the Reasonover-White Tape are also consistent in all relevant respects to Petitioner's Statements to Officer Ron Pike on January 3, 1983. (Trial Tr., at 560-63), and Petitioner's statements to Officer Marsha Vogt on February 25, 1983. (Suppression Hr'g Tr., at 92-99). See infra, Discussion, Section III.B.4.
[30] The Court notes that Petitioner statements on the Reasonover-White Tape are also consistent in all relevant respects to Petitioner's Statements to Officer Ron Pike on January 3, 1983. (Trial Tr., at 560-63).
[31] Subsequent to Petitioner's trial, the Missouri Supreme Court held that hypnotically refreshed testimony is not admissible at trial. See Alsbach v. Bader, 700 S.W.2d 823, 829 (Mo.1985) (en banc).
[32] Stanley White testified that he has never met a man named Robert McIntosh. (Sta. White Test.).
[33] In ruling on the merits of Petitioner's constitutional claims, the provisions of the Anti-terrorism and Effective Death Penalty Act ("AEDPA") do not apply because this case was filed before the AEDPA became effective. See Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997) (holding that the provisions of the AEDPA "apply only to cases filed after the Act became effective"). See also, Docket # 52, 80. If the AEDPA were applicable in this case, the violation of Petitioner's "clearly established" constitutional rights, see infra, would still warrant habeas relief, even under the AEDPA's more rigorous standards.
[34] The Court summarizes this evidence as follows. The St. Louis County Prosecutor who made the amended recommendation crossed out with an "X" the original recommendation on the court file, and wrote "6 months bench prob." (Pet.Ex.33). At the plea proceeding, Nancy Marks, a St. Louis County Prosecutor, represented the State, and Rob Maurer represented Jolliff. (Id.).

Nancy Marks was not available to testify at the evidentiary hearing. Rob Maurer testified that he had never spoke to or met Jolliff prior to the plea proceeding. (Maurer Test.). He testified that he had no contact with the prosecutor's officer about Jolliff's cases prior to the plea proceeding, and that the State's recommendation had already been made before he entered the courtroom. (Id.). Although Maurer represented Jolliff in the consummation of the plea agreement, he does not know anything about how the agreement came into existence. (Id.). Maurer does not know who changed Jolliff's original recommendation. (Id.). Maurer represented Jolliff at the plea proceeding only after being summoned, just moments before, by "somebody" who told him that he was needed in the division where the plea proceeding was set to take place. (Id.).
During the relevant time, only Sean O'Hagan, Larry Mooney. Buzz Westfall, and Steven Goldman had the authority to make, or change, recommendations on behalf of the St. Louis County Prosecutor's Office. (O'Hagan Test., Mooney Test.). It was the practice of Sean O'Hagan and Larry Mooney to initial and date any changes to a State's recommendation. (O'Hagan Test., Mooney Test.). Because the change to Jolliff's recommendation was neither signed nor dated. O'Hagan and Mooney testified that they did not change the recommendation. (Id.). Although Buzz Westfall did not testify at the hearing, several witnesses testified that Westfall only made plea recommendations in extraordinary cases. (Sto. White Test., O'Hagan Test.). Steven Goldman denied changing Rose Jolliff's recommendation, and denied directing Nancy Marks to change Jolliff's recommendation. (Goldman Test.).
[35] The Court relies, in part, on an affidavit from Forriss Elliott who was unavailable at the time of the evidentiary hearing. (Pet.App. 1623-26; Docket # 109, Ex. A).
[36] To the extent that the State would have limited its cross-examination of Petitioner in an effort to avoid admission of the Reasonover-White Tape. (Goldman Test., Docket # 61, Ex. A), the Court believes that the State's case would have been weakened significantly. In this situation, Petitioner's direct testimony would have been presented to the jury without a direct challenge from the State.
[37] As discussed supra, Discussion, Section IV. B.1. the Court finds that Petitioner would have testified at trial if the State had disclosed the Reasonover-White Tape.